[S. F. No. 17080.   In Bank.   Feb. 20, 1945.]

THELMA L. LASHLEY, Appellant, v. GEORGE E. KOERBER, M. D., Respondent.

84

Charles Reagh for Appellant.

Appelbaum & Mitchell and John Jewett Earle for Respondent.

SCHAUER, J.—This is an appeal from a judgment of nonsuit in a malpractice action. The complaint alleges negligent diagnosis and treatment by defendant physician (by virtue of his failure to have X-ray pictures taken) of a fractured terminal phalanx of one of plaintiff's fingers, and proximately ensuing damage. We have concluded that the evidence is not as a matter of law insufficient to support the essential averments of the complaint.

Plaintiff, her husband, and the defendant were the only testifying witnesses. ▮▮▮ Under well-established rules we must, in considering whether the judgment of nonsuit was proper, resolve every conflict in their testimonies in favor of plaintiff, consider every inference which can reasonably be drawn and every presumption which can fairly be deemed to arise in support of plaintiff, and accept as true all evidence

adduced, direct and indirect, which tends to sustain plaintiff's case. The circumstances of plaintiff's treatment were as follows:

Plaintiff testified that on Saturday, August 30, 1941, her right ring finger was caught and crushed in a folding bed. She bathed the finger in hot salt water and the following day attempted to consult defendant doctor but was unable to reach him. On Tuesday, September 2, the first day plaintiff was able to get in touch with defendant, she went to his office and told him she thought her finger was broken; "he looked at it and said he thought it was too, and I asked him if he didn't want me to have an X-ray taken and he said no, it would not be necessary." Plaintiff's hand was so swollen and painful that defendant could not put splints on the finger until two days later. On Thursday, September 4, when defendant first splinted the finger it was "so swollen still and so crooked that he could not manipulate the finger even yet, but he did put splints on it and left it crooked the way it was at that time." On this occasion plaintiff "asked Dr. Koerber to be sure, if he couldn't fix my finger, to send me to a bone specialist because I didn't want a crippled finger the rest of my life." On several occasions thereafter plaintiff asked defendant about an X-ray picture and defendant stated it would not be necessary to have one taken. Defendant "asked me at one time if I had arthritis and I told him I had never known of it if I did have and I had never been told about having it. . . . He spoke about my large knuckles and I told him that was due to snapping my fingers." According to plaintiff's testimony she saw defendant approximately every ten days or two weeks during October and November. Her finger remained swollen and crooked. About October 25 plaintiff "on my own volition" had an X-ray picture made by a Dr. Stein. Dr. Stein did not treat the finger or remove the splint applied by defendant. Defendant did not see this X-ray; "He didn't ask to see it" although told by plaintiff that she had had it taken. Either "right after I had the X-ray taken" or "around the 20th or 25th" of November plaintiff told defendant "what the X-ray showed, and he told me I could remove the splint for a while and see if it would heal any better without it." Defendant then removed the splint. Plaintiff asked about an *operation on the finger* and defendant said "that it wouldn't do any good to rush an operation if it would help." About Janu-

ary 2, 1942, plaintiff and her husband visited defendant and *she again inquired* "about operating on the finger to remove the bone shown in the X-ray I had taken by Dr. Stein." According to the testimony of plaintiff's husband defendant then "told her to . . . have an X-ray taken, stating that he *should* have done it in the beginning; and my wife said, 'Yes, I know, Doctor, I insisted on that to start with.' Dr. Koerber stated, 'Yes, . . . I know, it is not your *fault,* Mrs. Lashley, it is *all my own.'*" (Italics added.)

An X-ray picture was taken. It showed, according to the report of the roentgenologist, dated January 2, 1942, a "Fracture of the base of the terminal phalanx whose shaft is *markedly displaced*" (italics added) and, in defendant's opinion, evidence of an arthritic process which had prevented healing. After he had examined this X-ray picture defendant "said he didn't think *after this length of time* it would do any good to operate on it." (Italics added.) On defendant's advice plaintiff went to Dr. Barnard, an orthopedic specialist who, plaintiff's counsel admitted, "is one of the best." Dr. Barnard examined and taped the finger.

The only direct expert testimony was that of defendant. He testified as follows: In case of a fracture of the phalanx a splint is applied "in the position in which healing is most apt to occur, and that it just what I did in this case." At the time defendant applied the splint, "to the extent of clinically treating a fracture of that phalanx I knew that there was a chip off the posterior surface of the phalanx. . . . Any X-ray that might have been taken on September 2nd would merely have been a confirmation of my clinical judgment regarding that fracture. . . . At the time this finger was splinted it was still slightly swollen and inflamed from the crushing force of her injury. The finger was brought up in as full extension as possible, and that is all that anybody can do to reduce that type of fracture. There is no such thing as setting the fracture. What you have to do is to set the main bone as closely as possible to the place that is fractured off," and that was done in this case.

Defendant further testified: As a general proposition a latent arthritic condition tends to retard healing and calls for additional care on the part of the physician. The defendant "made no laboratory test for arthritis; I depended on my senses, my sight and sense of touch." He believed that plain-

tiff had a latent tendency toward development of arthritis "but there was absolutely no acute arthritis present. . . . In any event, even if she had had acute arthritis, no material difference could be made in the treatment. The treatment is still to splint the finger and keep it immobilized in a condition in which healing is most likely to take place, *which is full extension. . . . I knew the finger had to be splinted in full extension,* and simply having taken an X-ray would have perhaps added some slight confirmation to what I did but it would not have changed what I did in the slightest, nor would it have changed the eventual result." (Italics added.)

Defendant testified further that about four weeks after he first treated the injury, at a time just before plaintiff had the X-ray taken by Dr. Stein, "I realized that perhaps it was a little slow in healing but I fully expected that fracture would heal and that she would have a good result from it. . . . Even by that time it is extremely doubtful to me if the arthritis would have shown definitely in the X-ray, at four weeks after the injury." His testimony continues:

"Q. You would have been able to see that the fragment of bone was uniting or out of position, wouldn't you? A. Yes.

"Q. And it would instantly make you suspicious that something was keeping it from uniting properly, wouldn't it? A. Yes, I will admit that.

"Q. And if you had taken an X-ray at that time you would have known there was something wrong, wouldn't you? A. I would have known that the healing was slow.

"Q. You would have known that the bone, the fragment, the chip, wasn't in the proper position, wouldn't you? A. I am not willing to admit that at all.

"Q. When do you think that fragment or chip got out of position? A. Some time after the splint was removed [between October 25 and November 25]. . . . As long as the splint was on there it could not have gotten as badly out of position as it shows in the X-ray.

"Q. It could have gotten partly out of position, couldn't it? A. Yes."

At the time to which the testimony last above quoted relates, i. e., about four weeks after the injury, defendant "splinted her finger [and] I said, 'Well, when this looks like it needs changing you come back and I will replace it.' She never came back after that [until she returned and told defendant

of the X-ray taken by Dr. Stein] and I assumed her finger was getting along all right. I am not going to phone her and ask her why she doesn't come in—— perhaps might have but it is not customary. I assume my patients have enough common sense to tell when a splint needs changing, because it is common to get dirty in the course of some days or a week or so with household duties.''

Defendant was asked, ''When did you first become suspicious in this case that you were not going to get a favorable result?'' and testified, ''After she returned to me on or about the 1st of December.'' ''[A]t that time the condition of the finger was essentially as shown on that X-ray [taken about January 2 at defendant's direction].'' Defendant also testified that ''As far as I know, while she was my patient she did everything I told her to up to the first of January, 1942''; that on the first of January the result was final and ''Anything that would be done thereafter would be a fresh operation.''

The only testimony as to plaintiff's discharge was that of defendant: that plaintiff returned to his office a few days after she had seen Dr. Barnard; that she said she had removed the splint or tape which Dr. Barnard put on the finger because it was uncomfortable; and that defendant told her, ''if you are not going to follow out the treatment that he orders for you and maintain the splint he applied on your finger, there is nothing further that I can do for you.'' According to defendant, ''If the splint was painful the way he [Dr. Barnard] applied it, it could have been readjusted very slightly to relieve the discomfort,'' and keeping the finger taped or splinted in traction for a ''matter of weeks . . . as a matter of general average . . . four weeks might very well have corrected that deformity. . . . It may not have been a perfect finger when it was through, but it would have been a lot better than it is now.''

Defendant testified (on cross-examination under § 2055, Code Civ. Proc.) that of eight doctors in general practice in the community whom he questioned ''seven said that it was their custom to treat such fractures without invariably demanding an X-ray.''

Certain general propositions applicable in malpractice actions are thus stated in *Engelking* v. *Carlson* (1939), 13 Cal. 2d 216, 220, 221 [88 P.2d 695]: ''The law has never held a

physician or surgeon liable for every untoward result which may occur in medical practice. It requires only that he shall have the degre of learning and skill ordinarily possessed by physicians of good standing practicing in the same locality and that he shall use ordinary care and diligence in applying that learning and skill to the treatment of his patient. [Citation.] Whether he has done so in a particular case is a question for experts and can be established only by their testimony. [Citations.] . . . Negligence on the part of a physician or surgeon will not be presumed; it must be affirmatively proved. . . . It is true that in a restricted class of cases the courts have applied the doctrine of *res ipsa loquitur* in malpractice cases. But it has only been invoked where a layman is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.'' And as further enunciated in *Bickford* v. *Lawson* (1938), 27 Cal.App.2d 416, 421 [81 P.2d 216], ''The necessity of employing an X-ray apparatus in reducing a fractured limb depends entirely upon the circumstances of the particular case. The question as to whether the reduction and treatment of a fractured limb without the use of an X-ray machine constitutes negligence, depends upon what an ordinarily skilled physician practicing in that vicinity, in the exercise of due care and professional judgment, would be required to do under like circumstances. The determination of those questions depends upon expert testimony. [Citations.]''

■ The expert testimony which establishes plaintiff's prima facie case in a malpractice action may be that of defendant. (*Lawless* v. *Calaway* (1944), 24 Cal.2d 81, 90 [147 P.2d 604]; *Anderson* v. *Stump* (1941), 42 Cal.App.2d 761, 765 [109 P.2d 1027].) We can presume that defendant in testifying will state his case as favorably to himself as possible. (See *Alper* v. *Tormey* (1907), 7 Cal.App. 8, 12 [93 P. 402].) ■ And extrajudicial admissions of defendant have the same legal competency as direct expert testimony to establish the critical averments of the complaint. (*Scott* v. *Sciaroni* (1924), 66 Cal.App. 577, 582 [226 P. 827].) ■ It is true that an extrajudicial statement amounting to no more than an admission of bona fide mistake of judgment or untoward result of treatment is not alone sufficient to permit the inference of breach of duty; the statement ''must be an

admission of negligence or lack of skill ordinarily required for the performance of the work undertaken." (*Markart* v. *Zeimer* (1924), 67 Cal.App. 363, 371 [227 P. 683].) But as above indicated, in reviewing a judgment of nonsuit, where defendant's statements or inferences drawn therefrom conflict, the conflict must be resolved in favor of plaintiff; where the statements are reasonably susceptible of more than one meaning, that meaning is to be placed on them which is favorable to plaintiff.

According to the testimony of plaintiff's husband, the defendant stated "that he *should* have" had an X-ray taken "in the beginning; and my wife said, 'Yes, I know, Doctor, I insisted on that to start with.' Dr. Koerber stated, 'Yes, . . . I know, it is not your *fault*, . . . it is *all my own.*' " (Italics added.) The jury would have a right to believe that defendant, as a physician and surgeon, was using the word "should" to import the duty which he, as a physician and surgeon practicing his profession in that community, owed to his patient in the exercise of ordinary care. Webster (New Int. Dict. (2d ed.)) says, "*Ought* and *should* express obligation, OUGHT commonly suggesting duty or moral constraint, SHOULD, the obligation of fitness, propriety, expediency and the like." Furthermore, coupled with defendant's statement as to what he should have done "in the beginning" is the admission that the failure to have an X-ray taken was all his own "fault." The word "fault" in one of its meanings signifies "Responsibility for wrongdoing or failure; culpable cause." (Webster's New Int. Dict. (2d ed.) ; see, also, *Marston* v. *Pickwick Stages, Inc.* (1926), 78 Cal.App. 526, 534 [248 P. 930].) When the defendant finally did have an X-ray picture taken it showed, according to the report of the roentgenologist, a "Fracture of the base of the terminal phalanx whose shaft is *markedly displaced.*" (Italics added.) It does not require the testimony of an expert, under the conditions shown here, to support the conclusion that a piece of bone which is markedly displaced from the larger bone from which it has been detached is not in proper healing position.

The X-ray picture was not taken until January 2, 1942, and upon examining it defendant stated that "he didn't think *after this length of time* it would do any good to operate on [the finger]." (Italics added.) Defendant testified that "the

condition of the finger was essentially'' the same about the first of December (as it was after January 2), but at the earlier date (December 1), according to plaintiff's testimony, defendant said, ''it wouldn't do any good to *rush* an operation.'' (Italics added.)

On cross-examination defendant admitted that if he had had an X-ray picture taken in the early stages of his treatment of the fracture he ''would have been able to see that the fragment of bone was uniting or out of position'' and that it would have made him ''suspicious that something was keeping it from uniting properly.'' Yet after the time to which such admissions related the defendant, still without requiring an X-ray picture, removed the splint to ''see if it [the finger] would heal any better without it.'' When defendant originally splinted the finger, according to plaintiff, he ''left it crooked the way it was at that time,'' although as a witness defendant admitted that he ''knew the finger had to be splinted in full extension.'' It is true that defendant also testified that ''The finger was brought up in as full extension as possible, and that is all that anybody can do to reduce that type of fracture.'' But the jury need not have believed such statement. It but created a conflict with the inferences to be drawn from defendant's admissions as to what should have been done in the beginning, as to his culpable negligence in not having taken an X-ray picture earlier, and as to his opinion in January, 1942, that ''he didn't think after this length of time it would do any good to operate.'' The implication of the latter statement would seem to be that an earlier operation would have benefited plaintiff and, hence, that defendant was mistaken in his statement that merely splinting the finger ''in as full extension as possible . . . is all that anybody can do to reduce that type of fracture.''

An extrajudicial admission of ''fault,'' it has been held, may amount to no more than an admission of bona fide mistake or misfortune and thus be insufficient to establish negligence (*Phillips* v. *Powell* (1930), 210 Cal. 39, 43 [290 P. 441] [admission that ''it is my fault''] ; *Markart* v. *Zeimer* (1924), *supra*, 67 Cal.App. 363, 371 [admission that defendant performed a ''wrong operation''] ; *Donahoo* v. *Lovas* (1930), 105 Cal.App. 705, 707, 710 [288 P. 698] [admission that defendant ''should never have'' administered an injection ''and that was what was causing'' plaintiff pain]), or it may sup-

port the inference that plaintiff was damaged as a proximate result of defendant's negligence (*Scott* v. *Sciaroni* (1924), *supra,* 66 Cal.App. 577, 580, 582 [admission that defendant's nurse "left the radium on too long" and "it was his [defendant's] fault" that plaintiff was burned]).

In the present case we are satisfied that a jury, considering the background of all the other evidence, could reasonably conclude that the admissions of defendant physician imported that he had not exercised that reasonable degree of skill and learning and care ordinarily exercised by other doctors of good standing practicing in the community and that as a proximate result of such negligence plaintiff suffered damage. To phrase it differently, in the light of the seeming conflicts in defendant's testimony and all the other circumstances of the case, his admissions that he "should" have had an X-ray taken "in the beginning" and that he was at "fault" in that regard constitute evidence of a character competent to require that the issue of defendant's negligence be decided as one of fact rather than of law.

For the reasons above stated the judgment is reversed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., and Traynor, J., concurred.