[L. A. No. 20012.   In Bank.   July 31, 1947.]

BESS McCURDY, Appellant, v. J. GORDON HATFIELD, Respondent.

J. M. Clements for Appellant.

Reed & Kirtland, Henry E. Kappler and Fred O. Reed for Respondent.

GIBSON, C. J.—The sole question presented, on this appeal from a judgment of nonsuit, is whether plaintiff made a prima facie case of malpractice in the treatment of injuries to her arm and shoulder. She relies on the testimony of defendant doctor as to what was proper practice, and she contends that defendant negligently departed from that practice by commencing manipulative treatments at too early a date and by improperly carrying the treatments beyond the point of tolerance.

There are sharp conflicts in the evidence as to the time defendant began the manipulative treatments and as to their extent and character. According to defendant's testimony, the manner, time and extent of the treatments were strictly in accord with what he testified was proper practice. However, in passing on the propriety of a judgment of nonsuit every favorable inference and presumption fairly arising from the evidence must be considered, and all evidence tending to sustain plaintiff's case must be accepted as true. The evidence of the defendant in a malpractice case comes within this rule and is to be considered, together with any other evidence, in the light most favorable to plaintiff. (*Lashley* v. *Koerber*, 26 Cal.2d 83, 90 [156 P.2d 441].)

Plaintiff was injured on January 4, 1944, and she received immediate treatment from defendant, an osteopathic

physician and surgeon, in whose office she was employed as medical secretary. X-ray pictures disclosed a fracture of the humerus which was technically described as an "epicondyle fracture, transverse fracture of the longitudinal epicondyle" extending down into the elbow joint. Her arm was placed in a plaster cast with the forearm in a horizontal position. Infra-red light treatments were administered until January 31, when the cast was cut and further X-ray pictures were taken.

Plaintiff testified that on February 3, which was about four weeks after the fracture, defendant massaged her arm and flexed her elbow about in "all directions" for about 10 minutes. At that time she could not voluntarily move her elbow, and the manipulation caused very definite pain. On February 5, he gave the same manipulative treatment, except that it was more vigorous. She complained of the pain and told him she could not stand it, but he continued the manipulation after she made the complaint. Defendant massaged her arm and flexed her elbow every few days thereafter, and each of the subsequent treatments was "more violent and longer." She cried after every treatment and repeatedly told defendant the manipulation was painful and that "there was a limit to what [she] could stand," but he told her she was "babyish," and that "it had to be done to get a good arm." On March 3 or 4 defendant "did violent manipulation," pulling the arm violently. Plaintiff screamed with pain, but defendant did not stop the treatment.

On March 14, defendant, with the assistance of another doctor, gave plaintiff an anesthetic, and her arm was then extended and straightened to the full 180-degree angle. Plaintiff stated that after this occurred her shoulder, arm and hand were swollen, inflamed and stiff, and as time went on the condition of her hand became worse. A few days later he swung her arm while she was holding a weight, and the pain was so intense she "couldn't stand it." On March 24, she again returned to his office and "screamed" from pain when her right hand was extended above her head. After this last treatment she dismissed defendant and secured another doctor.

Before plaintiff broke her arm she had operated a typewriter and played the piano. She testified that after the fracture, and before her arm was manipulated under the anaesthetic, she was able to "make a fist" and run the scale on the piano. She could not do so thereafter or at the time of trial,

nor could she operate a typewriter, although in recent months she had noticed an improvement in her arm and hand.

Defendant, whose testimony preceded that given by plaintiff, was examined under the provisions of section 2055 of the Code of Civil Procedure. He testified that he gave the first manipulative treatment on February 14, which was six weeks after the arm was fractured. Defendant stated that "as a matter of precaution we don't do any degree of manipulation . . . in a four-week period," because it requires six weeks for the callus formation to be firm enough to permit manipulation. When asked whether he had continued to manipulate plaintiff's elbow after she complained of pain he replied: "No, I do not manipulate the joint of that kind. We use what is known as the manipulation to tolerance, and that is the point at which the patient begins to complain." He also stated that if manipulation was carried beyond this point "there would be danger of doing injury to the bone which had been fractured"; and that "there [are] always adhesions forming in a condition of this kind, and if you force beyond the point of a patient's tolerance you would be breaking those adhesions." He was then asked, "Q. . . . it is necessary, then, in treatment of a fracture of this type to be very careful about the manipulation of the joint beyond tolerance? . . . A. That is correct. Q. In addition to being brutal, that would be bad practice, wouldn't it? . . . A. Yes."

A physician is required to have the degree of learning and skill possessed by physicians of good standing practicing in the same locality, and it is his duty to use ordinary care and diligence in applying that learning and skill in the treatment of patients. (*Lashley* v. *Koerber, supra,* 26 Cal.2d 83, 89; *Lawless* v. *Calaway,* 24 Cal.2d 80, 86 [147 P.2d 604].)

The negligence of the doctor may be established by his own testimony elicited under section 2055 of the Code of Civil Procedure. (*Lashley* v. *Koerber, supra; Lawless* v. *Calaway, supra.*) Although the defendant here did not expressly refer to the practice followed by other doctors in the community, he did testify as to what was proper practice, and it is reasonable to infer that his testimony was based on the standard of care used by physicians in the locality. If he failed to conform to the proper practice as set forth in his testimony, he did not act as a reasonable physician should under the circumstances.

When plaintiff's evidence is considered in the light of these factors, it is apparent that she has established a

prima facie case of negligence. The evidence would have supported findings that the first manipulative treatment was given on February 3, about four weeks after the fracture, that four others were given within six weeks of the accident and that, despite plaintiff's protests and repeated declarations of pain, the manipulation was carried beyond the point of tolerance. Accordingly, a jury could have found that defendant was negligent in departing from the standard of care required.

The judgment is reversed.

Shenk, J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.