[Civ. No. 15372. First Dist., Div. One. Feb. 5, 1954.]

CARRIE E. DICKOW et al., Appellants, v. FRANKLIN COOKINHAM et al., Respondents.

Ernest I. Spiegl and Elliot M. Epsteen for Appellants.

Robert L. Lamb, Harry Gottesfeld and Cooley, Crowley & Gaither for Respondents.

BRAY, J.—In a malpractice action plaintiffs appeal from a judgment entered on a directed verdict in favor of defendants.

### QUESTIONS PRESENTED

1. Sufficiency of the evidence.
2. Is this court limited to the ground given by the trial court for its action?
3. Should evidence have been admitted to show that release of one tort feasor was not intended to release other tort feasors?

### RECORD

Plaintiffs' complaint charged defendants with malpractice in negligently failing to examine plaintiff* Carrie Dickow's back and failing and refusing negligently to adjust or correct her cast, as a result of which a sore or ulcer developed and remained untreated, and plaintiff's flesh was eaten away, causing great pain, a scar and permanent injury. At the end of plaintiffs' case the court granted a directed verdict solely upon the ground that plaintiffs failed "to prove negligence as alleged . . ."

### 1. *Sufficiency of Evidence.*

■ It is so well settled as to no longer require citation of authorities that in reviewing a directed verdict, this court is required to determine if there is any substantial evidence or any reasonable inferences therefrom which would support a verdict for plaintiffs.

---

*Unless otherwise appearing, "plaintiff" will refer to plaintiff Carrie E. Dickow.

September 11, 1947, plaintiff was struck by a falling plank. She was taken to the hospital and defendants, licensed physicians, undertook to treat her. X-rays disclosed, and her injury was diagnosed as a compression fracture of the twelfth thoracic vertebra. There was a swelling which defendants contend extended below for a distance of about two vertebrae, although records made by defendants indicate that the swelling was limited to the area of the twelfth vertebra. On September 13th a cast was applied which covered plaintiff's entire trunk, from the base of the neck to and over the buttocks. September 14th a piece of the cast covering plaintiff's chest broke off and was replaced by defendants. There was no attempt made to clean out any of the debris or crumbs of plaster that may have remained from the break or mending process. Four or five days later a ''window'' was cut in the front of the cast and again no attempt to clean the debris was made. September 16th plaintiff complained of a pain in the lower part of her back, below the area of the twelfth thoracic vertebra. Defendants told her it was ''referred pain,'' that it would last for 10 days, then disappear. By the 22d or 23d the pain in the region of the twelfth thoracic vertebra had stopped but the pain in the lower back continued. Plaintiff complained to defendants that the pain in that region was getting worse and was told that she would have to expect a lot of pain. From time to time she complained to defendants of this pain, but they did nothing about it. September 26th, plaintiff asked defendant Cookinham to look under the cast, that ''I was sticking to something.'' He refused. She told him that the pain was so bad that the nurses could not rub the upper part of her thighs because the pulling of the skin in the pain area was so painful she could not stand it. About September 27th she again asked defendant Cookinham why the lower back could be so painful when the fracture was in the upper back. He again stated it was because of referred pain. She complained to defendant Cookinham each day thereafter including October 1st, and asked for an examination under the cast. He placed his hand under the cast. This caused the pain to be excruciating and plaintiff cried out. Defendant Cookinham then stated that she had ''a pinched nerve there.'' He did nothing further. Later that same day plaintiff requested the nurse to look under the cast. She did and then told plaintiff, ''You have a big ulcerated sore here.'' The nurse applied medication with a swab stick, which on removal was covered with

pus. Defendant Cookinham was called and for the first time looked under the cast. He stated that "it was a pressure sore" and that the cast would come off the next day. The next day a portion of the cast was cut as hereafter set forth. The cast was not removed for several months. No contention is made that after discovery of the ulcer defendants improperly treated it.

The malpractice charge is the failure of defendants to discover and treat the ulcer during its development period. The ulcer left a scar about two inches long which attached to the spine. It is for this scar plus the pain suffered by plaintiff that damages are sought. Defendants denied plaintiff's complaints of pain prior to October 1st, and testified that the cause of the ulcer was disturbed circulation and internal pressure and not pressure of the cast. Plaintiffs introduced no medical testimony on this subject, relying entirely upon the circumstances and the statements and actions of defendants. Significant upon the question of whether the cast caused the pressure which caused the ulcer is the fact that the opening cut in the cast on October 2d apparently was to relieve pressure and could not be used for treatment, and that both defendants at first claimed that it was for the latter purpose. In his deposition defendant Cookinham, and at the trial both defendants testified that on October 2d they cut a "window" in the cast over the ulcer area to treat it, and that through that window they both saw and treated the ulcer. However, the cast had been preserved and upon being confronted with it and seeing that while they had cut the plaster away, they had not cut the lining, they admitted that their testimony as to seeing and treating through this hole was incorrect. Moreover, prior to the production of the cast they had testified that the swelling was at the twelfth thoracic vertebra and that the ulcer was near it. After its production, they contended that the swelling had started at the twelfth thoracic and extended down to the area over which the window was located. Plaintiff Henry Dickow testified that when he asked defendant Cookinham what caused the sore the latter pointed his finger to where the hole in the back of the cast had been cut and said, "You see how thick that plaster is there? . . . There was tremendous pressure on her body from that cast, and that is a pressure sore." Defendant Cookinham on cross-examination stated that in the exercise of the skill and learning possessed by physicians and surgeons in his position in the community the required

precautionary measures would include periodic examination under the cast to ascertain if ulcers were developing. The nurse, plaintiff Henry, and two other witnesses testified that the ulcer could easily be seen by looking under the cast from below.

Although defendants' evidence was contradictory of most of plaintiff's evidence, it is clear that from the foregoing evidence the jury could have found that defendants in disregarding plaintiff's complaints and making no examination to ascertain the cause thereof, were negligent in not exercising the skill usual in the vicinity; that as a result the pressure of the cast caused the ulcer to develop, or at least, that the negligent failure to treat the developing ulcer, caused plaintiff's ultimate injury. Defendants cite *Huffman* v. *Lindquist*, 37 Cal.2d 465 [234 P.2d 34], to the effect that generally whether a doctor possesses or exercises the requisite skill is a question for experts and then contend there is no expert testimony in favor of plaintiffs in this case. It might be pointed out that in the Huffman case the court said (p. 474): "While in a restricted class of malpractice cases the courts have applied the doctrine of res ipsa loquitur, that has only been where 'negligence on the part of a doctor is demonstrated by facts which can be evaluated by resort to common knowledge [and] expert testimony is not required since scientific enlightenment is not essential for the determination of an obvious fact.' " It is not necessary for us to determine whether the fact that pressure of a cast on a swelling in the body will cause trouble is a matter of general knowledge,* for there is medical evidence through the statement of defendant Cookinham to plaintiff Henry Dickow that such pressure did cause this particular sore and the same defendant's testimony that ordinary care required that a doctor examine to prevent the very thing that occurred here, namely, the development of an ulcer. "The negligence of the doctor may be established by his own testimony elicited under section 2055 of the Code of Civil Procedure. (*Lashley* v. *Koerber, supra* [26 Cal.2d 83 (156 P.2d 441)]; *Lawless* v. *Calaway, supra* [24 Cal.2d 81 (147 P.2d 604)].) Although the defendant here did not expressly refer to the practice followed by other doctors in the community, he did testify as to what was proper practice, and it is reasonable to infer that

*See interesting discussion of common knowledge as to surgery in *Thomsen* v. *Burgeson*, 26 Cal.App.2d 235 [79 P.2d 136].

his testimony was based on the standard of care used by physicians in the locality. ▮ If he failed to conform to the proper practice as set forth in his testimony, he did not act as a reasonable physician should under the circumstances.'' (*McCurdy* v. *Hatfield*, 30 Cal.2d 492, 495 [183 P.2d 269].)

▮ Dr. Cookinham testified that originally there were no bruises or lacerations or marks upon plaintiff's body. After placing herself in defendants' care plaintiff finds herself with a serious scar, the ulcer causing which defendants failed to discover through failure to use ordinary care. This, at least, made out a prima facie case, requiring defendants to explain how it was caused and that it was not caused by their negligence. Their explanation that the swelling was in a different location and caused by internal pressure is contradicted by the location of the ulcer and defendant Cookinham's admission that it was caused by the cast. This evidence, in spite of evidence to the contrary, was sufficient to require that the jury determine the true facts.

2. *Other ground.*

Defendants pleaded and introduced in evidence a certain release executed by plaintiffs. They contend that this bars any recovery by plaintiffs. Plaintiffs contend that this court may not consider the effect of the release to support the trial court in granting the directed verdict for the reason that the court expressly granted it ''on the sole ground of failure to prove negligence as alleged, otherwise denied.'' In *Lawless* v. *Calaway*, 24 Cal.2d 81, 92 [147 P.2d 604], the court pointed out the conflict of authority in this state between the cases holding that the court on an appeal from a judgment on an order granting nonsuit or on a directed verdict will ordinarily consider only the grounds specified in the motion at the trial, and the cases holding that the reviewing court may consider any ground that appears in the record, whether made a ground of the motion or not. It then holds that the correct rule is that grounds not specified in a motion for nonsuit will be considered by an appellate court only if it is clear that the defect is one which could not have been remedied had it been called to the attention of plaintiff by motion. In our case the alleged bar of the release was made a ground of the motion for directed verdict. In addition, if defendants' contention as to the effect of the release is correct, it would be a complete bar to the action. It therefore becomes necessary for us to determine whether the release is a bar to this action.

### 3. *Release.*

It is executed by both plaintiffs, and acknowledges receipt of $10,750 in full settlement, release and discharge of "all actions, claims and demands whatsoever, that may now or hereafter exist against Robert P. Kelly on account of injuries to the person of, and damage to the property of the undersigned, *and the treatment thereof and the consequences flowing therefrom* . . . for which the undersigned claims the above named persons or parties are legally liable" as a result of the accident suffered by plaintiff. (Emphasis added.) It warrants that it "is executed without reliance upon any statement or representation by the person or parties released or their representatives of physicians concerning the nature and extent of the injuries and damage and liability therefor;" that it applies to "all unknown injuries and damage resulting from said accident, casualty, or event as well as to those now known." It is dated September 30, 1948, almost a year after the discovery of plaintiff's ulcer. It was given to one Domke, a claims adjuster for the insurance company which insured Kelly, the person responsible for plaintiff's initial injury, and the $10,750 was paid by that company. Defendants contend that as Kelly, under the law, was liable not only for the original injury but also for any additional injury caused by malpractice in the treatment of the original injury (see *Ash* v. *Mortensen,* 24 Cal.2d 654 [150 P.2d 876]), a release of Kelly operated to release defendants also. They contend, further, that the very terms of the release—among others "the treatment thereof and the consequences flowing therefrom"—included any claim of plaintiffs against defendants. At the time of the making of the release plaintiff had two actions pending, one against Kelly alone and this action against defendants. Plaintiffs contend that neither by its terms nor in fact did the release apply to defendants. Plaintiffs offered evidence to prove that it was not intended to do so, but this offer was rejected by the trial court.

The relationship between an original wrongdoer and a physician negligently magnifying the original injury and the effect of a release of the former has been decided in California. In *Ash* v. *Mortensen, supra,* 24 Cal.2d 654, a woman injured in an automobile accident sued the negligent motorist and recovered judgment for her injuries. She accepted a reduced sum in settlement of the judgment, which she satisfied of record. She also released the motorist from further lia-

bility. Later she brought an action for malpractice against the doctors who treated her injuries. The doctors set up the defense of the judgment, its satisfaction and the release, contending that since the woman could have recovered damages resulting from the alleged malpractice from the motorist, the release and satisfaction were a complete defense to the action against them. The court held that under the law "It is settled that where one who has suffered personal injuries by reason of the tortious act of another exercises due care in securing the services of a doctor and his injuries are aggravated by the negligence of such doctor, the law regards the act of the original wrongdoer as a proximate cause of the damages flowing from the subsequent negligent medical treatment and holds him liable therefor." (P. 657.) It then stated that the fact that the woman in the action brought against the original wrongdoer could have obtained full compensation for all damages does not establish that she was so compensated. The independent and successive acts of the motorist and the doctors produced two separate injuries and gave rise to two distinct causes of action. The woman was at liberty to sue in separate actions the original wrongdoer for damages resulting from the original injury alone and to sue the doctors for damages resulting from the additional injury or aggravation. Therefore, the plea of former recovery involves a consideration of what the injured party did in fact recover in her action against the original wrongdoer rather than what she could have recovered therein. The court then referred to a contention of the doctors, similar to that of defendants here, that the release operated to discharge them, regardless of the evidence in the original case or of the nature and extent of the recovery. The court pointed out that in a number of jurisdictions it is the rule that, regardless of whether the consideration for the release covered both injuries, a release of the original wrongdoer would release the doctors. The court then said (pp. 658-659) : "But the conclusion that the release of the original wrongdoer releases the attending doctor from liability for malpractice has been reached by treating the independent wrongdoers as joint tort feasors or applying, by analogy, the common-law rule of unity of discharge affecting joint tort feasors. The common-law rule of unity of discharge is based on the concept of the unity of a cause of action against joint tort feasors, and its application to the facts of the present case would give the independent tort

feasors herein an advantage wholly inconsistent with the nature of their liability. . . .

"A release of a cause of action against a wrongdoer is not a release of a separate or distinct cause of action against another independent wrongdoer. . . . We are of the opinion that a release of the original wrongdoer should release an attending doctor from liability for aggravation of the injury 'if there has been full compensation for both injuries, but not otherwise.' "

The court stated that there are cases holding that the payment of any sum in consideration of the release of one of several joint or independent concurrent tort feasors will be presumed to have been made and accepted as full compensation or satisfaction for the alleged injury and said (p. 660): "But whatever may be the rule with regard to a settlement with joint or independent tort feasors whose acts concur to produce a single injury, it does not follow that such presumption should be indulged where, as here, the injured person's claim embraces separate injuries caused by independent successive tort feasors and is liquidated by a judgment against the original tort feasor. The presumption of full compensation or satisfaction found in the cited cases must be based on the fact that there is but a single indivisible injury and that the claim arising therefrom is unliquidated. Under the circumstances of this case, it would be more logical to presume that part payment of the Wubben judgment represented merely the best obtainable compromise for the liability of the judgment debtor." The court then went on to point out that the damages from the original injury and from the malpractice were divisible and that the doctors had the right in the action against them to have the damages restricted to the difference between such damages and the sum already received by the injured person.

 Defendants in our case were permitted to prove the circumstances under which the release was executed, but not the conversations of the parties concerning it. Plaintiffs offered to prove the statements of Domke and other circumstances tending to show that the release was given and accepted on the express understanding that while it would release Kelly from any liability for the malpractice injuries, it was not to release defendants and that the amount paid did not cover these injuries. The court should have permitted this testimony and also the cross-examination of Domke on the subject. Cases like *Hawber* v. *Raley*, 92 Cal.App. 701 [268

P. 943], *Cowles* v. *Independent Elevator Co.,* 22 Cal.App.2d 109 [70 P.2d 711], *Sunset Scavenger Corp.* v. *Oddou,* 11 Cal. App.2d 92 [53 P.2d 188], *Bee* v. *Cooper,* 217 Cal. 96 [17 P.2d 740], and others cited by defendants, deal with *joint* tort feasors, and therefore are not in point. In *Ash* v. *Mortensen, supra,* 24 Cal.2d 654, the court pointed out that there is a difference between joint tort feasors and independent tort feasors. In *Alexander* v. *Hammarberg,* 103 Cal.App.2d 872 [230 P.2d 399], this court discussed at some length the difference between the two and held that the release of one independent tort feasor did not necessarily release the other. In *Gerald* v. *San Francisco Unified School Dist.,* 121 Cal.App. 2d 761 [264 P.2d 90], we again discussed the question of joint and independent tort feasors, and held that the tort feasors there were independent ones and that the release of one of them did not release the others unless it should appear that "full compensation was made for plaintiff's injuries," that the question of whether it was made was one of fact, and that to withdraw that issue from the jury was error. While the release by its terms releases Kelly from all claims for the injuries caused by defendants, its language does not purport to release defendants. Therefore, parol evidence would be admissible to determine the intention of the parties in giving and accepting the release. Therefore, to not permit the facts as to whether the moneys paid plaintiffs by Kelly's insurance carrier compensated for both injuries or was intended to do so, to be shown and the jury to pass upon them, was error. The release may be a bar to the present action, but its mere production does not constitute it such.

As the case will have to be retried, we deem it unnecessary to consider the many other assignments of error made by plaintiffs.

The judgment is reversed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied March 31, 1954. Schauer, J., was on the opinion that the petition should be granted.