[Civ. No. 20353.   First Dist., Div. Two.   Oct. 15, 1962.]

YVONNE J. EVANS et al., Plaintiffs and Appellants, v. JEAN ALBERT SARRAIL, Defendant and Respondent.

Jack H. Werchick for Plaintiffs and Appellants.

Lamb, Hoge & Glynn and Peart, Baraty & Hassard for Defendant and Respondent.

KAUFMAN, P. J.—Plaintiffs, Yvonne J. Evans and her husband, John, appeal from an adverse judgment in their action for malpractice, entered on an order granting a motion for a directed verdict made after the jury failed to agree on a verdict, pursuant to section 630 of the Code of Civil Procedure. Their complaint alleged negligent diagnosis and treatment by the defendant physician, Dr. J. A. Sarrail, an ophthalmologist, of Mrs. Evans' eye condition as glaucoma, and proximately ensuing damage, including the mental suffering and fear resulting from the faulty advice to avoid pregnancy.

The rule as to motions under section 630 is the same as that applicable to nonsuits (*Carpenter* v. *Atchison, T. & S. F. Ry. Co.*, 109 Cal.App.2d 18, 23 [240 P.2d 5]). Thus, the only question before us is whether there is any evidence from which the jury could have found for the appellants.

The circumstances of Mrs. Evans' treatment were as follows: In May 1952, when she was 32 years old, Mrs. Evans had suffered severe frontal headaches for several months. Her family physician, Dr. Stuehler, upon finding no reason for the headaches after extensive examinations, suspected glaucoma, and referred her to the respondent, an experienced ophthalmologist. She first saw the respondent on June 7, 1952, at which time, he made extensive eye examinations and took her intraocular pressure, which was 30 millimeters. While a reading of 29 is within normal limits, 30 is considered

"borderline." She returned for further tests on June 10; the subsequent pressure readings on that date were 35, 37 and 40, 40. Respondent then diagnosed her condition as chronic simple glaucoma, and prescribed drops to lower the pressure. He saw her about once a month thereafter until August 1957, and repeatedly tested her intraocular pressure and changed the prescription for the drops when she developed allergic reactions. In June 1956, respondent felt that Mrs. Evans' condition had responded well to the treatment and attempted to see if the intraocular pressure could be controlled without the drops. After three weeks without drops, the pressure returned to the borderline, and the respondent again prescribed the drops. By 1957, due to new developments in the field of ophthalmology, he concluded that Mrs. Evans had intermittent glaucoma.

Mrs. Evans testified that the respondent told her she had glaucoma and warned her not to become pregnant because of the eye condition. Respondent denied making this statement. In the fall of 1957, Mrs. Evans consulted Dr. Stuehler again, who confirmed her suspicions of pregnancy. Mrs. Evans testified that she wanted another child but Dr. Stuehler's records indicated that she had told him that she did not want another child as she was too old. Because of his concern about her eye condition, Dr. Stuehler called the respondent, who indicated that Mrs. Evans' condition was not severe enough to warrant an interruption of the pregnancy. Mrs. Evans further testified that she consulted Dr. Shaffer, another ophthalmologist, who told her that she had never had glaucoma and that Dr. Sarrail had made a mistake; that since 1957, she had not used the drops or had any eye treatment except by an optometrist.

Dr. Shaffer, who testified for the appellants at the trial, denied these statements and further testified that he first saw Mrs. Evans in September 1957, and could find no increased intraocular pressure at that time; the results of his test were exactly the same as Dr. Sarrail's the last time he saw Mrs. Evans in August 1957. He did, however, find an enlarged blind spot in one eye which was consistent with the existence of glaucoma at one time. He further testified glaucoma was not one but a series of forty to fifty diseases, all producing increased pressure; that chronic simple glaucoma was difficult to diagnose, as there were few symptoms, if any, as well as individual and diurnal variations of pressure; that progress in the classification of the disease had been made in

recent years. Dr. Shaffer examined Mrs. Evans on two occasions but she did not come back for additional tests. He further stated that it was possible that she had glaucoma before he saw her but he would have had to see Mrs. Evans over a long period of time to be certain that no glaucoma was present; that on the basis of his records, he was not able to say whether or not Mrs. Evans had ever had glaucoma.

In 1959, at the request of counsel, Mrs. Evans consulted another ophthalmologist, Dr. Bettmann. He testified that he was unable to complete his examination as she would not let him put drops in her eyes and measure the intraocular pressure; that in his limited examination, he found a symptom indicative of glaucoma, but could not say that she had ever had it.

The theory of appellants' complaint was that Dr. Sarrail had erroneously diagnosed Mrs. Evans' increased intraocular pressure as glaucoma, had erroneously treated her therefor for a period of five and one-half years, and had thus subjected her to the unnecessary expense and discomfort of the treatment, as well as the mental suffering and fear of avoiding further pregnancy, which was contrary to her religious beliefs.

On this appeal, we need consider only the evidence most favorable to the appellants (*Wickoff* v. *James*, 159 Cal. App.2d 664 [324 P.2d 661]) and must resolve every conflict in the testimony in favor of the appellants and consider any inference which can reasonably be deduced, as well as every presumption which can fairly be deemed to arise in favor of the appellants (*Lashley* v. *Koerber*, 26 Cal.2d 83 [156 P.2d 441]). Other general principles applicable to a case of this kind are that the negligence on the part of the physician will not be presumed but must be affirmatively proved (*Lashley* v. *Koerber, supra*). Here, the diagnosis and treatment were clearly a matter outside the realm of a layman's experience and a matter for expert testimony only so the question is whether Dr. Sarrail had the reasonable degree of skill and learning possessed by others of his profession in the same locality and exercised reasonable and ordinary skill in the application thereof (*Stephenson* v. *Kaiser Foundation Hospitals*, 203 Cal.App.2d 631 [21 Cal.Rptr. 646]).

The uncontroverted expert evidence here indicated that simple glaucoma is a condition not easy to diagnose and that extensive tests are necessary for a diagnosis; that simple glaucoma has few symptoms and none which would reveal

themselves readily to a layman, as the condition is a gradual one, in which the increasing intraocular pressure damages the optical nerve, resulting in the blurring of peripheral fields of vision and finally blindness; that it was good practice to treat a borderline case such as Mrs. Evans' immediately, as once a loss of vision occurs, it cannot be regained; that the condition could not be cured but only controlled by means of drugs which lowered the pressure; that there was only a tenuous connection between pregnancy and glaucoma; that between 1952 and 1957, new tests and theories about glaucoma were being developed and that while earlier, it has been believed that the disease was permanent, the authorities now recognize an incipient or intermittent type of glaucoma, which has no effect on fields of vision.

As there is no evidence in the record to indicate that there was any negligence on the part of Dr. Sarrail, we can only conclude that the trial court properly granted the motion for a directed verdict under section 630 of the Code of Civil Procedure.

Judgment affirmed.

Shoemaker, J., and Agee, J., concurred.

A petition for a rehearing was denied November 1, 1962.