[Civ. No. 26622.   Second Dist., Div. Two.   May 27, 1963.]

ALINE V. MYERS, Plaintiff and Appellant, v. WILLIAM ROSS, Defendant and Respondent.

Benjamin F. Kosdon for Plaintiff and Appellant.

Gilbert, Thompson & Kelly, William D. Jennett and Jean Wunderlich for Defendant and Respondent.

FOX, P. J.—Plaintiff brought this action to recover damages for alleged dental malpractice. She claims that in the course of defendant's dental work, he severed the nerve serving the left portion of her lower lip, causing numbness thereof. The court directed a verdict for defendant. Plaintiff has appealed from the ensuing judgment.

Viewing the evidence in the light most favorable to the plaintiff since this was a directed verdict, these are the essential facts:

In December 1958 plaintiff was having trouble with her upper denture. It was loose and "kept dropping down." She wanted an upper plate that would fit better. She (and her husband) went to Dr. Ross for an examination of her mouth "to see if he could make a better set of uppers." After his examination, the doctor indicated he could do the job. Plaintiff was not having any pain or discomfort with her "lowers." She had no trouble at all with her lower gum area. On a later occasion defendant told plaintiff that he would have to perform an alveolectomy[1] on her lower gums in order to get "a flatter bite."

During the initial surgery (the alveolectomy) on February 28, 1959, the doctor split her lower gums clear across from one molar to the other, using a knife and also a chisel and mallet. He did not take any X-ray of plaintiff's mouth. Approximately eight sutures were required to sew up this incision which was about 1⅝ inches in length. Prior to this surgery, plaintiff had approximately 5/16 of an inch of lower gum line. After some six weeks the doctor made plaintiff a

---

[1] One of the witnesses described an alveolectomy as "a removal of the rough edges of jaw bone which sometimes exist after teeth are extracted."

set of dentures, but they did not fit. Plaintiff did not have any numb feeling in her lip following the first surgery.

Some weeks later the doctor advised plaintiff further surgery was necessary. When asked why this was necessary, the doctor said: "It is one I failed to get." This referred to a sequestrum.[2] An X-ray of "the one spot" was taken prior to this operation which was performed on May 13. Plaintiff was given some pills and a local anaesthetic. An incision of approximately 5/8 of an inch was made in her gum. Defendant also used a mallet and chisel and an electric drill. That evening plaintiff became alarmed because the numbness had not left her lip. She telephoned the doctor who said, "Think nothing of it; it will go away in a few days." When plaintiff came back to the doctor's office he told her that he "cut a nerve"; that he went "deep, very deep." Later he explained that there is a big nerve "lying right down in here";[3] that he cut it; and that it would take a few days—maybe a few weeks—to regenerate. Some two and a half weeks after the operation plaintiff complained of the trouble she was having. Defendant responded, "Sure, I gave you bone surgery. That is the worst you can have."

Dr. Tracy Putnam, an experienced neurologist and neurosurgeon, testified, after examining plaintiff, that he "reached the conclusion that in fact the mandibular, the mental branch of the mandibular nerve had been cut. . . ." He further testified, after examining certain X-rays of plaintiff's lower left jaw, that he "felt that the mental nerve had been severed in the course of the operation and that the foramen or opening through which it emerged had been destroyed. . . ." In response to a question as to why the nerve had not regenerated, he replied: "It is because the foramen . . . has been obliterated by the surgery."

Dr. Max Shapiro, an experienced dentist who had performed "perhaps 100 or so" alveolectomies, after examining plaintiff's mouth, expressed the opinion that the mental nerve

---

[2]Defendant defined a sequestrum as "a portion of bone of no definite size which separates from the main body of bone [of] which it was formerly a part through the process of necrosis," i.e. dying.

[3]From the testimony it appears that the mandibular nerve runs through a canal "quite near" the surface in the lower jaw almost to the midline. Near this point it divides. One branch comes out through an opening which is the mental foramen, and from this point on the nerve is called the mental nerve (or the inferior mental nerve). This is the nerve that supplies the lower lip and the adjacent portion of the cheek and the gums. It is this nerve that was severed.

648

had been severed. He also stated that the numbness in plaintiff's lower lip on the left side is due to the severance of this nerve. Dr. Shapiro also explained that a dentist can tell when he is getting close to this nerve by feeling the mental foramen —"by touching it on the surface of the jaw," and, he added, that "in doing the surgery, that is one of the things that has to be looked out for by palpating this area." Dr. Shapiro further stated that these nerves "very rarely" regenerate after being severed.

Defendant is a doctor of dental surgery, duly licensed as such, and engaged in the practice of his profession in Newhall in Los Angeles County. Plaintiff's doctor had suggested that she see a dentist because her dentures did not fit comfortably. Defendant told plaintiff that he probably could help her, "if these little sharp margins were smoothed down."

Defendant explained the procedure by which he performed each of the operations. As might be expected it differed substantially from plaintiff's account thereof. But in view of the procedural posture of this case in the trial court it would be unprofitable to summarize this aspect of his testimony.

Near the conclusion of defendant's direct testimony he stated it would be apparent to him if he severed a nerve because he "could see it." In explanation he further stated: "When you make an incision in the mucous membrane and work in that area if you came upon a nerve of that size [the size of the inferior mental nerve] you certainly would see it." He also testified that "[i]n this case where the mucous membrane was very thin there was very little hemorrhage." This, he said, would make it easier to see the nerve.

On cross-examination defendant was asked: "Is the mental inferior nerve so large that you can see it?" The defendant replied, "It would be discernible, yes." But he "did not" see it. He also stated, "There was no nerve where I operated." Neither did he see the foramen—"the opening through which the nerve comes." Finally, on this point, these questions and answers:

"Q. By Mr. Kosdon: Doctor, if you went in with a surgical instrument and cut into the gum tissue and went into the gum tissue close to the foramen, you wouldn't know whether you cut the nerve or not then, would you? A. Yes.

"Q. How could you tell? A. By seeing it if it were there."

The basic question on this appeal is: Did plaintiff make a prima facie showing of negligence on the part of defendant that proximately caused the left portion of her lower

lip to become numb? ▮▮ "According to established principles it is our duty, in determining an appeal from a judgment entered on a directed verdict, to consider only the evidence most favorable to plaintiff, together with every inference which can reasonably be drawn and every presumption which can fairly be deemed to arise therefrom in support of plaintiff. [Citations.]" (*Wood* v. *Samaritan Institution, Inc.*, 26 Cal.2d 847, 849 [161 P.2d 556].)

We must resolve every conflict in the evidence in favor of plaintiff and accept as true all evidence, direct and indirect, that tends to support the plaintiff's case. (*Stephenson* v. *Kaiser Foundation Hospitals*, 203 Cal.App.2d 631, 634 [21 Cal.Rptr. 646].) If there is any substantial evidence from which the jury could have found for plaintiff, the judgment must be reversed. (*Anthony* v. *Hobbie*, 25 Cal.2d 814, 817 [155 P.2d 826].)

▮▮ Applying these principles we are persuaded that plaintiff made out a prima facie case on the theory of ordinary negligence. Initially there can be no doubt that she made a prima facie showing that defendant severed the inferior mental nerve in her left lower jaw. Her testimony as to defendant's admission that he cut a "big nerve" in the operative area, and the testimony of Dr. Putnam and Dr. Shapiro, is more than ample on this point. Likewise there is no doubt that she made a sufficient showing of causal connection between the severance of the nerve and the numbness of her lip. The evidence showed that this nerve supplied the lower lip, and Dr. Shapiro testified that the numbness of plaintiff's lip was due to the severance of the nerve.

▮▮ The question now arises: Was there any evidence from which an inference of negligence on the part of defendant reasonably could be drawn? There are a multitude of cases holding that in order for a plaintiff to recover in a malpractice case (absent a situation that permits the application of the doctrine of res ipsa loquitur), he must present expert testimony relative to the standard of skill and learning of members of the profession in good standing in the locality and proof on the question of the propriety of particular conduct by the practitioner in the particular instance. (See, e.g., *Stephenson* v. *Kaiser Foundation Hospitals, supra,* p. 635, and cases there cited.) Examination of these cases discloses, generally speaking, that they involve diagnosis, treatment or procedures that are so intricate or so little understood by lay-

men that the trier of the facts would in all probability know nothing about the same, hence they must be guided by opinions of witnesses having special knowledge in the particular field.

On the other side of the legal picture in this field are the situations where it is a matter of common knowledge among laymen that the event or incident in question ordinarily would not happen without negligence. In such cases it is unnecessary to produce expert testimony (see e.g., *Armstrong* v. *Wallace,* 8 Cal.App.2d 429 [47 P.2d 740]—sponge left in abdomen; *Thomsen* v. *Burgeson,* 26 Cal.App.2d 235 [79 P.2d 136]—child's uvula removed during tonsillectomy).

There is another group of malpractice cases where the plaintiff has been permitted to make out a prima facie case through the extrajudicial statements or admissions of the defendant (*Scott* v. *Sciaroni,* 66 Cal.App. 577 [226 P. 827]; *Lashley* v. *Koerber,* 26 Cal.2d 83 [156 P.2d 441]), or through the testimony of the defendant (*Seneris* v. *Haas,* 45 Cal.2d 811 [291 P.2d 915, 53 A.L.R.2d 124]; *Lawless* v. *Calaway,* 24 Cal.2d 81 [147 P.2d 604]) given under section 2055, Code of Civil Procedure. (*McCurdy* v. *Hatfield,* 30 Cal.2d 492 [183 P.2d 269].) It may be presumed that a "defendant in testifying will state his case as favorably to himself as possible." (*Lashley* v. *Koerber, supra,* p. 89.) Where the extrajudicial statements of the defendant "are reasonably susceptible of more than one meaning, that meaning is to be placed on them which is favorable to plaintiff." (*Lashley* v. *Koerber, supra,* p. 90; *Sheffield* v. *Runner,* 163 Cal.App.2d 48 [328 P.2d 828].)

The instant case is more nearly akin to the last group of cases. It should also be pointed out that we have no problem of diagnosis or major surgical procedure. In fact defendant characterized the surgery as "very, very minor," and his counsel told the jury in his opening statement that "[t]his so-called operation is not one of major surgery. It is hardly classed as minor surgery. . . ."

A case in some respects strikingly similar to the one at bench arose some years ago in Colorado (*Daly* v. *Lininger,* 87 Colo. 401 [288 P. 633]). In that case a dentist was removing an abscessed area in his patient's lower left jaw through which ran *the same nerve* that is here involved, and in so doing he severed said nerve. The jury returned a verdict for defendant. Plaintiff appealed on the ground that the court erroneously instructed the jury that proof of negligence can

be shown only by the testimony of experts. The judgment was reversed. In the course of the opinion the court stated (p. 636 of 288 P.): "The defendant testified that he did not know when the inferior dental nerve[4] was severed, and that he continued his operation although he could not at all times see what he was doing on account of the profuse flow of blood. It is reasonable to assume that the nerve was severed at a time when the profuse flow of blood obstructed the defendant's vision. The negligence involved is not the adoption of an incorrect diagnosis or standard of treatment, but, having adopted a proper standard of treatment, consists in the performance thereof in a negligent manner. In such a case any pertinent evidence having any fair tendency to sustain the charge of negligence will be sufficient to take the question to the jury." This language is apposite to our case as an analysis of our factual situation will show.

Dr. Shapiro testified that a dentist can tell when he is getting close to the inferior mental nerve by feeling the mental foramen—by touching it on the surface of the jaw—and that in doing surgery in that area the inferior mental nerve is one of the things that must be looked out for and this may be done by palpating the area.

In his conversation with plaintiff, defendant referred to the nerve he cut as "a big nerve." On the witness stand he acknowledged that this nerve was large enough to be "discernible"; that when you make an incision in the mucous membrane and work in that area if you come upon a nerve the size of the inferior mental nerve you certainly would see it; that it would be apparent to him if he severed the inferior mental nerve because "he could see it." He noted that in this case there was very little hemorrhage and that made it easier to see the nerve. Notwithstanding this testimony defendant admitted on cross-examination that he did not see the inferior mental nerve, and finally declared, "There was no nerve where I operated." He also admitted he did not see the foramen. In contrast is the testimony of Dr. Putnam, after examining X-rays of plaintiff's lower left jaw, that in the course of the operation "the foramen . . . had been destroyed" and his statement that the nerve would not regenerate "because the foramen . . . has been obliterated by the

---

[4] In designating the nerve here involved the terms inferior mental nerve and inferior dental nerve are apparently used interchangeably. (Footnote ours.)

surgery." Also, pertinent here is defendant's statement to plaintiff that in removing the small piece of bone he went "deep, very deep," and yet he did not see either the nerve or foramen, or become aware of the presence of the nerve although the testimony of Dr. Shapiro and Dr. Putnam clearly indicated it was very near the surface, the former stating that a dentist could tell when he is getting close to this nerve by feeling the mental foramen—"by touching it on the surface of the jaw."

From the foregoing evidence the jury reasonably could have drawn the inference that defendant in probing and cutting into plaintiff's jaw to remove the little piece of bone (which he described as "about the size of a grain of sand") did not exercise ordinary care under the circumstances to avoid severing the inferior mental nerve which he knew was in that area but whose presence he did not discover although its precise location was ascertainable by palpating the area and it was large enough to be seen; and that as a proximate result of defendant's negligence plaintiff's inferior mental nerve was severed and that this caused the numbness in her lower left lip. Plaintiff established a prima facie case and was entitled to have the jury pass upon its merits. The court was not warranted in directing a verdict for the defendant.

In view of our decision it is unnecessary to pass upon other questions that counsel have debated for most of them need not arise upon a retrial.

The judgment is reversed.

Ashburn, J., and Herndon, J., concurred.