[Civ. No. 4255. Fourth Dist. June 18, 1952.]

ADOLPH E. NORDEN, Appellant, v. PAUL HARTMAN, Respondent.

752

Nottbusch & Nottbusch for Appellant.

Gray, Cary, Ames & Frye for Respondent.

GRIFFIN, J.—Plaintiff recovered a jury verdict for $25,-000 against defendant for claimed malpractice. The court granted a new trial upon the ground of insufficiency of the evidence to support the verdict.

On May 15, 1942, plaintiff, aged 55, as a result of a 12-foot fall, suffered a very severe comminuted (crushed or shattered)

fracture of his right os calcis or heel bone. The injury was covered by workmen's compensation. Plaintiff was, after first aid, treated by Dr. Markey, who promptly had him hospitalized and referred the case to Dr. Redell, a specialist in industrial surgery. On May 25, 1942, he was, at the request of Dr. Redell, examined by Dr. West, a specialist in orthopedic surgery, and two days later, Drs. West and Redell undertook a reduction of the fracture. At the time he was hospitalized, and because of a rather extensive amount of swelling and ecchymosis, i.e., hemorrhage, black and blueness around the foot and ankle, the patient remained in bed, foot elevated, and in ice packs in an attempt to control the swelling and hemorrhage and to decrease the swelling. There was a local area about the size of a quarter just below and anterior to the medial malleolus where the skin was quite black and showed evidence of an intending slough, i.e., the tissue was devitalized and appeared like it was going to slough out. Under a general anaesthetic a wire was placed through the upper, posterior portion of the os calcis and one through the lower third of the leg bone in an attempt to pull the bone down to reduce the bad squashing effect. The foot was then placed in a cast.

On July 31, 1942, plaintiff was released from the hospital but remained under the care of Dr. Redell until August 28, 1942, when that doctor entered the military service and plaintiff's case was taken over by a Dr. West. On April 9, 1943, in an endeavor to obtain a usable foot rather than amputate, Dr. West performed what is known as a "triple arthrodesis," or a removal of the bearing surface between certain bones of the foot so that those bones would fuse together. On June 10, 1943, Dr. West entered the military service and plaintiff's case was referred to defendant, Dr. Hartman. Since plaintiff was still unable to use his foot, and since the bones did not heal in proper alignment, a new operation was performed on May 12, 1944, by defendant in order to reconstruct the foot. This operation consisted of an arthrodesis between tibia and astragalus, so as to freeze the ankle, and the breaking up and changing of the old arthrodesis. It was this operation and the following postoperative treatment of which plaintiff complains. After the operation, a slough appeared at the site of the operation but not extending throughout the operated area, and an infection developed. This condition was treated by defendant until the middle of October. At the request of the insurance carrier, after a

report of defendant's condition was made to it, plaintiff was sent to Los Angeles to be hospitalized. On November 29, 1944, an operation was there performed by Dr. Early to remove certain bones of the foot that appeared devitalized. On January 25, 1945, Dr. Early removed the remaining bones of the foot and about one month later the foot was amputated above the ankle.

The main argument of counsel for plaintiff is that there is no substantial conflict in the testimony on the material issues, and the evidence as a whole would not support a verdict in favor of the defendant; that therefore the order granting defendant's motion for a new trial because of the insufficiency of the evidence cannot be sustained.

The first doctor who was consulted in reference to plaintiff's injury indicated that he desired to have the case referred to a specialist because of the seriousness of the injury. After the specialist endeavored to reduce the fracture he foresaw that additional surgery would be necessary; that in an effort to avoid an amputation and give the man a usable foot, the additional operation was recommended. On July 25, 1942, additional X rays showed a displacement and in September, 1942, it showed pronounced "decalcification . . . lack of circulation." In November, 1942, Dr. West reported plaintiff completely disabled, and after further X rays, further surgery was recommended. Dr. West performed a second operation. Dr. Hartman first saw plaintiff on June 11, 1943. He removed the cast and started physiotherapy. Dr. Hartman was represented as being one of the leading orthopedic surgeons of the city at that time and he had taken over the practice of several other leading orthopedic surgeons who had entered the service. In July, 1943, the X ray showed commencement of ankylosis. There also appeared to be considerable osteopetrosis and demineralization of the bones. During the balance of the year 1943, plaintiff suffered pain, and the heel did not remain in position due to the multiple fracture. The patient was sent to a staff of doctors in Los Angeles. In January, 1944, Dr. Hartman was instructed by them to give Mr. Norden further exercises, baths and massages and plaintiff was discharged from the hospital March 10, as somewhat improved although the pain still persisted. In April, 1944, at the suggestion of the insurance carrier and after X rays, it was recommended that an attempt be made to improve the position of the bones in the foot and to fuse the joint and remove bony structure causing discomfort. On May 12, 1944, plaintiff

was admitted to the hospital and a third operation was performed by Dr. Hartman. No infection was apparent, and the cast was placed on the foot and leg. He was discharged from the hospital on June 2d. The time is indefinite, but soon after the operation plaintiff complained of swelling and pain in his foot. Plaintiff lived about 40 miles from the doctor's office and tried to visit it about every third day. At one of these first visits Dr. Hartman cut a window in the plaster cast and treated the foot for some infection. The infection was not at the site of the surgery. There is testimony that the infection was due to lack of proper circulation and to the patient's own systematic condition, and not a result of the surgery. According to the testimony, penicillin was not available to civilian population in 1944, but only to the Naval hospital. The evidence further shows that to avoid making daily trips to the doctor's office plaintiff was instructed by the doctor how to treat the infection and change the dressings for himself at home and he did this for a period of time. In September the foot became worse and plaintiff discovered maggots and a bad odor at the site of the infection. Dr. Hartman accused plaintiff of allowing flies to lay eggs in the wound, and he thereafter continued to treat it over a period of time. He reported the condition to the insurance carrier and on October 14, 1944, it ordered the patient to its hospital in Los Angeles for further observation and treatment. Dr. Hartman did not see the patient thereafter. The patient was under observation at that place for 30 days and a Dr. Johnstone removed the affected portion of the foot. On December 25, the infection was reported as subsided and the plaintiff left for the home of relatives for Christmas. Immediately thereafter he returned to the Los Angeles hospital with a flare-up of new infection and high temperature. One month's treatment ensued. Ultimately, in January, 1945, his foot was amputated. A total of nine doctors were engaged in rendering service to plaintiff over a period of three years. Out of the five operations had upon plaintiff's foot, plaintiff selected defendant's third operation and postoperative treatment as the cause of his present condition, and on October 13, 1945, this action was filed against defendant and was tried in January, 1951. Seven doctors testified on behalf of the defendant and not one testified that in his opinion defendant failed to follow the accepted practice in San Diego County in operating upon and in treating plaintiff's foot, or that his conduct did not conform to the standards of propriety and

care required. After reciting the method of treatment of plaintiff's foot by Dr. Hartman, whenever the question was asked, the experts expressed the opinion that defendant did not fail to use the degree of care required of him. They testified generally that his method "was customary and approved technique of top flight orthopedic surgeons in this area"; that "this infection which you have described in these series of events did not occur as an acute post-operative infection, that is, an introduction at the time of surgery"; that as to the presence of maggots, ". . . The significance would be to me that it had been contaminated in some way either as the dressings had been applied or directly to the local surface by flies"; that infection "is not at all uncommon in orthopedic cases where there is this type of bone involvement"; that in some cases in the past maggots were inserted into the wounds deliberately by doctors of medicine because they feed only on dead tissue, and they have been used in the treatment of osteomyelitis and upon infections to clear out the dead necrotic tissues; that "Dr. Hartman's post-operative treatment of Mr. Norden was in conformity with the accepted standard of procedure of orthopedic surgeons possessing and exercising a reasonable degree of learning, skill and care in this community at that time"; that the amputation was not due to Dr. Hartman's postoperative care; that each successive operation increases chances of infection; that Dr. Hartman's post-operative care of plaintiff was not the producing cause of the amputation; and that the postoperative care given by him was in complete conformance to the highest standards of post-operative care of orthopedic specialists at the time; that infection is a hazard of surgery and that it is more hazardous where you have to do more than one operation because of the lack of circulation of blood to the foot.

No medical experts were called by plaintiff to testify that the care following defendant's third operation was not the standard degree of care that should have been given under the circumstances related. Plaintiff relies upon the testimony of the plaintiff, the deposition of defendant taken under section 2055 of the Code of Civil Procedure (in which he related the care he gave to plaintiff), the charts of the several doctors, and the facts above indicated to establish his case, and argues that no judgment in favor of defendant could have been predicated upon this evidence as a matter of law.

■■ As pointed out by defendant's counsel, we are not here confronted with the problem as to whether the evidence

would support a judgment for plaintiff. An appeal from the order here involved turns essentially on one point firmly established by the authorities in California, such as *Ballard* v. *Pacific Greyhound Lines,* 28 Cal.2d 357 [170 P.2d 465], and *Barcus* v. *Campbell,* 90 Cal.App.2d 768 [204 P.2d 65], which recites that it is the duty of the trial court to grant a new trial whenever in its opinion the evidence on which the decision rests is insufficient to justify the decision, and the court's action in granting such new trial on this ground is discretionary to the extent that if any appreciable conflict exists in the evidence such action may not be disturbed on appeal.

A mere examination of the evidence, without any further discussion on the subject, clearly shows that it would support a verdict in favor of defendant.

Plaintiff relies primarily on certain claimed reasons set forth in a written opinion given by the trial judge in granting the motion. Therein plaintiff's contentions are set up, i. e., "that there is sufficient evidence in the record to indicate that the defendant failed to anticipate secondary infection, which is a constant hazard in operations such as that performed upon plaintiff's foot; that the defendant was negligent when he instructed the plaintiff to use his foot, whereas the better practice would have been to have the foot elevated in order to curb the infection; that the defendant was negligent in not taking X-rays; that the defendant was negligent in failing to prescribe and administer penicillin; that the defendant was negligent in failing honestly to deal with plaintiff in revealing the nature of plaintiff's condition with respect to infection; and that the defendant's negligence in allowing the infection to spread was the proximate cause of the partial amputation suffered by the plaintiff." The court advanced the argument that possible error might have resulted by introducing into evidence the amount of the lien of the compensation carrier. In answer to these questions the trial court stated: "The difficulties and uncertainties in the practice of medicine and surgery are such that no practitioner can be required to guarantee results, and all the law demands is that he bring and apply to the case in hand that degree of skill, care, knowledge and attention ordinarily possessed and exercised by practitioners of the medical profession under like circumstances. It is never enough to show that he has not treated the patient in that mode nor used those measures which in the opinion of others, even medical men, the case

required, because such evidence tends to prove errors of judgment for which the defendant is not responsible as much as the want of reasonable care and skill for which he may be responsible," citing *Hesler* v. *California Hospital Co.*, 178 Cal. 764 [174 P. 654]. "The present case shows a situation where what was done lies outside the realm of the layman's experience. Neither the court nor any lay person connected with this case could say as a matter of common knowledge what caused the infection or what caused the spread of the infection in plaintiff's foot. This is a matter for medical expert testimony. Medical evidence is required to show not only what occurred but how and why it occurred," citing *Sales* v. *Bacigalupi*, 47 Cal.App.2d 82 [117 P.2d 399].

Certain exceptions are noted in reference to the res ipsa loquitur rule, such as indicated in *Engelking* v. *Carlson*, 13 Cal.2d 216 [88 P.2d 695]. After some further dissertation the trial court concluded: "Because of the failure of proof to show that the defendant failed to exercise the requisite degree of care and that the proximate cause of the plaintiff's partial amputation was due to any act of malfeasance or nonfeasance on the part of the defendant, the motion for a new trial is granted."

It is not necessary to determine whether the reasons assigned by the trial court for granting a new trial are in harmony with the order made, if the evidence does in fact support the order and there is no abuse of discretion. ■ That order cannot be impeached by the judge's opinion. While it may aid the appellate court in ascertaining the process by which a judgment has been reached, it will not be conclusive in determining whether or not the order granting a new trial on the ground of the insufficiency of the evidence is supported by the evidence. (*Classen* v. *Thomas*, 164 Cal. 196 [128 P. 329]; *Stone* v. *Los Angeles County Flood Control Dist.*, 81 Cal.App. 2d 902 [185 P.2d 396]; *Estate of Finkler*, 7 Cal.2d 97 [59 P.2d 801]; *People* v. *Driggs*, 111 Cal.App. 42, 44 [295 P. 51]; *Buckhantz* v. *R. G. Hamilton & Co.*, 71 Cal.App.2d 777 [163 P.2d 756].)

This court has on many occasions commended the trial courts in granting new trials when, in the opinion of the court, sitting as a thirteenth juror, the weight of the evidence appears to be contrary to the jury's determination, particularly where the verdict appears to be excessive. This practice should not be discouraged. (*Tice* v. *Kaiser Co.*, 102 Cal.App.2d 44 [226 P.2d 624], and cases cited; *Sassano* v. *Roullard*, 27 Cal.App.2d

372 [81 P.2d 213].) ■ On appeal all presumptions are in favor of the order and against the verdict. (*Scott* v. *Renz*, 67 Cal.App.2d 428 [154 P.2d 738].)

■ Plaintiff insists that the doctrine of res ipsa loquitur, relative to the treatment rendered to the plaintiff subsequent to the operation of May 12, 1944, applies in this case. We see no merit to this argument. The parties admitted (according to the statement of the judge) that the doctrine was not applicable to the facts established. Even though such doctrine may have been applicable, which we do not conclude, any inference attempted to be raised thereby was rebutted and it would only create a conflict in the evidence, under which circumstances the trial court would be authorized to grant a new trial. (*Armstrong* v. *Pacific Greyhound Lines*, 74 Cal.App.2d 367 [168 P.2d 457].)

■ It is next argued by plaintiff that no conflict was raised in the evidence since the testimony of certain doctors that defendant exercised the required skill ordinarily possessed by physicians of good standing and practice in this locality was predicated upon hypothetical questions propounded to them in which questions (consuming several pages) the date of July 18, 1944, was erroneously stated to be the date when the infection became apparent, when in fact the evidence showed that the discovery date was June 21, 1944; that accordingly the answers to the hypothetical questions were of no force and effect, being predicated upon an erroneous set of facts. We see little merit to this argument. No objection was made to the form of question at the time. The witnesses were thoroughly cross-examined on the subject involved. Considering the entire questions, as propounded, it does not appear that the answers thereto would have been any different. In addition, it might be pointed out that defendant testified that the method pursued by him was according to the recognized standard above mentioned. This testimony was admissible, and was not based upon a hypothetical question. (*Lawless* v. *Calaway*, 24 Cal.2d 81 [147 P.2d 604]; *Callahan* v. *Hahnemann Hospital*, 1 Cal.2d 447 [35 P.2d 536].)

Lastly, it was argued before this court that it must have been the intention of the trial judge, who granted the new trial on the insufficiency of the evidence, to place the question of the necessity of expert testimony to fortify plaintiff's evidence before a verdict in his favor could be sustained, squarely before this court. We do not so conclude. At the completion of plaintiff's case, the court denied a motion for nonsuit. Ac-

cordingly, if the trial court was of the opinion indicated by counsel for defendant, it overlooked a very appropriate time to test the question. The same point was presented when defendant moved the court for a directed verdict predicated upon this ground. ▇ The discretionary powers given to a trial judge on a motion for new trial are much broader than those given in determining a motion for nonsuit or directed verdict. ▇ Ordinarily, where there is a conflict in the evidence, the determination of the trial judge on a motion for a new trial, predicated upon the ground of insufficiency of the evidence, will not be disturbed on appeal, in the absence of an abuse of discretion. No abuse of discretion here appears. (*Prescott* v. *City of Orange*, 56 Cal.App.2d 144 [132 P.2d 523] ; *Donahoo* v. *Lovas*, 105 Cal.App. 705 [288 P. 698].)

Order affirmed.

Barnard, P. J., and Mussell, J., concurred.