[Civ. No. 4898.   Fourth Dist.   July 11, 1955.]

ADOLPH E. NORDEN, Respondent, v. PAUL HARTMAN, Appellant.

334

Gray, Cary, Ames & Frye for Appellant.

Melvin M. Belli and Nottbusch & Nottbusch for Respondent.

BARNARD, P. J.—This is a malpractice action. On May 15, 1942, the plaintiff suffered a severe comminuted fracture of his right heel bone. He was hospitalized and treated by three doctors, including Dr. West who took charge of the case on August 28, 1942. On April 9, 1943, Dr. West performed a second operation known as a triple arthrodesis. On June 10, 1943, Dr. West entered the military service and the defendant took over the case. Because the patient was unable to use his foot, and because the bones had not healed in proper alignment, the defendant performed another operation on May 12, 1944. It is this operation and the following postoperative treatment of which the plaintiff complains. After this operation on May 12, 1944, a cast was put on the foot, and the plaintiff complained of terriffic pain and that the cast felt tight. Within a day or two, a small window was cut in the cast over the wound caused by the operation, and some medication was applied. There was some relief at first, but the plaintiff continued to feel pain and to complain that the cast was tight. On June 2, he was discharged from the hospital but was using crutches. On June 21, 1944, the defendant removed the cast,

and then observed a necrosis and a slough which later developed into a sinus at or near the site of the operation. The defendant treated this condition by various means, conservative in nature, until the middle of October, 1944. The condition failed to clear up and increased in size, and in late October the defendant notified the insurance company that the foot had not improved, and informed it of the slough area. The plaintiff was taken to Los Angeles and on November 14, 1944, another doctor performed an operation and removed certain dead or necrotic bones. On November 29, 1944, still another doctor performed another operation and removed more bone. Finally in January or February, 1945, the foot was amputated above the ankle.

This action was filed in October, 1945, but was not tried until several years later. A jury returned a verdict for $25,000 in favor of the plaintiff, and the court granted the defendant's motion for a new trial. On appeal, that order was affirmed (*Norden* v. *Hartman*, 111 Cal.App.2d 751 [245 P.2d 3].) Some of the facts are there more fully stated. The case was retried in March, 1954, with special emphasis on the tightness of the cast as a basis for the charge of negligence. The jury again returned a verdict for $25,000 in favor of the plaintiff. A motion for a new trial was denied, and the defendant has appealed from the judgment.

It is first contended that the verdict is erroneous because it is unsupported by any competent medical evidence that defendant was negligent or caused plaintiff any injury. It is argued that whether a doctor has used ordinary care in a particular case, in applying the learning and skill required of him to the treatment of his patient, is a question for experts and can be established only by such testimony; that the rule is that laymen on a jury cannot be permitted to speculate on matters that are exclusively within the knowledge of experts; that there was no testimony here by any doctor indicating any impropriety in the defendant's treatment of the plaintiff; that no expert testified that any act or omission of the defendant caused any of the injuries complained of; and that the expert testimony here was flatly to the effect that no negligence appeared, and that the plaintiff's troubles were the result of things beyond the control of the defendant.

The plaintiff testified that the cast put on by the defendant felt much worse than the cast previously put on by another doctor; that the cast was tight and there was a constant pain

in there which was terriffic at times; that he told the nurse to tell the doctor that he had to do something because of the pain; that the second day he told the defendant "that the cast hurt me, that it was tight and I was in awful agony, that he would have to do something"; that the defendant told the nurse to have a window cut in the cast; that the cast always felt tight in spite of the cutting of the window; that the cast "still seemed kind of tight" when he left the hospital; and that the cast was left on until June 21. Mrs. Norden testified that the day after the operation the plaintiff complained of extreme pain and throbbing in his foot and that the cast was so tight he said he could hardly bear it, and that she visited him in the hospital about twice a week and he continued to complain of the tightness of the cast.

The defendant testified that before he operated on May 12, 1944, there was no evidence of anything on the foot except a healed incision with a normal scar. In response to a hypothetical question as to whether a cast that was too tight at a particular pressure point at or near the surgical site, as the surgical site was in this case, could not have caused the same type of infection that was caused in this case, he replied that it could. When asked what else could have caused this infection he stated that it could also have been caused if the vascular system at or about the operation site was severed, or could have been caused by a blood clot landing somewhere. He further testified that in this case the cast was not too tight; that there is a universal precaution to be taken in casting; that the cast should not be too tight because of the danger of necrosis or sloughing off of skin; that when the patient tells you it is too tight it is something you would necessarily heed, in good medical practice; that when he took off the cast on June 21, it did not have a window in it; that when he took off the cast on that day he found that there was a "slough on the latteral side of the ankle down to the bone"; that this was the result of an infection; and that the amputation which later occurred was made necessary by an infection.

Dr. McPherson testified that this infection was caused by "some circulatory disturbance that produced a slough of an area of the skin which became infected, and there was some extension into the bone." Dr. West testified that it is well recognized medical practice to loosen a cast where it is too tight; that he would like to have some facts to go on as to whether it is too tight, as in every case patients complain that it is too tight; that where a cast has pressure at one particular

point there will be a resultant necrosis or death of that tissue if it remains for too long a time; that the cause of the amputation in this case was traceable back to an original infection whatever the cause of that infection was; that the original infection here was caused by circulatory impairment at a specific location in that foot and not by a general circulatory impairment through the entire system; that in his opinion the original infection here was not caused by any major interruption of the blood supply and not by any blood clot; and that from a statement of what occurred between the date of the operation and June 21, when the cast was removed, "it would lead me to believe the cast was not necessarily—was not on too tightly."

The general rules applicable to malpractice cases are well settled. A physician or surgeon is not liable for every untoward result which may occur. ▉ It is only required that he have the degree of learning and skill which is common in the medical profession in that locality, and that he exercise ordinary care in applying such learning and skill to the treatment of his patient. ▉ Whether or not he possesses or exercises the required learning or skill in a particular case is generally a question for experts and can be established only by their testimony, and such expert evidence is conclusive where the matter in issue is one within the knowledge of such experts only and not within the common knowledge of laymen. (*Huffman* v. *Lindquist*, 37 Cal.2d 465 [234 P.2d 34, 29 A.L.R.2d 485]; *Engelking* v. *Carlson*, 13 Cal.2d 216 [88 P.2d 695].) ▉ In some cases, however, even when the testimony of experts is uncontradicted, a question of fact may remain for the jury. ▉ The negligence of such a defendant may be established by the evidence produced by him. (*McCurdy* v. *Hatfield*, 30 Cal.2d 492 [183 P.2d 269].) ▉ The ultimate question which a jury must answer, and the question which an expert may answer for the purpose of furnshing evidence upon which the jury is to make up its mind, are not identical. ▉ Professional witnesses may testify concerning the teachings of their science and the customs of their craft, but whether these things disclose due care presents a question for the court or jury. (*Thomason* v. *Hethcock*, 7 Cal.App.2d 634 [46 P.2d 832].) In *Sim* v. *Weeks*, 7 Cal.App.2d 28 [45 P.2d 350], it is said:

"A charge of negligence in a choice of treatment is refuted, as a matter of law, by showing that a respectable minority of expert physicians approved the method selected. But where

a physician is charged with negligence in the actual performance of a treatment, after its method was chosen over others, evidence tending to show such negligence presents a case for the jury. . . . When a result may or may not be occasioned by malpractice, an expert medical witness invades the province of the jury when permitted to go beyond stating that it *could* and in saying that it *did* occasion the result. . . . But, when a result could have been occasioned by one of two or more causes, the ultimate fact of which cause occasioned the result is for determination by the jury, . . . ''

In *Dickow* v. *Cookinham*, 123 Cal.App.2d 81 [266 P.2d 63, 40 A.L.R.2d 1066], a judgment based on a directed verdict for the defendant was reversed. It was held that the jury could have found that the defendants were negligent in disregarding the plaintiff's complaint and making no examination to ascertain the cause thereof, or in failing to treat an ulcer which was developing under a cast and which could have been discovered.

On principle and authority, it must be held that there was a question here for the jury and that the evidence was sufficient to support the verdict. While the defendant testified that this cast was not too tight, there was other evidence justifying a contrary inference. While such questions as whether a cast should have been used, and as to the effect of a too-tight cast, were exclusively within the knowledge of experts, the question as to whether this particular cast was too tight was not and could not be exclusively within their knowledge, as experts. While the testimony of the experts here supports the method of treatment used by the defendant it does not necessarily disclose the absence of negligence in carrying out that treatment. Some of that testimony supports a contrary conclusion. All of the doctors testified that it is common medical practice to loosen a cast where it is too tight, and the defendant testified that, in good medical practice, the patient's complaint of tightness should be heeded. Dr. West testified that pressure from a cast at a particular point will cause a death of the tissue at that point if it remains too long; that the original infection here was caused by a circulatory impairment at a specific location; and that in his opinion this impairment was not caused by any major interruption of the blood supply or by a blood clot. While he later expressed an opinion that certain things would lead him to believe that this cast was not too tight, this was somewhat qualified by his use of the words ''not necessarily.''

There was expert evidence that this necrosis could have

been caused by this cast being too tight, and some expert evidence tending to exclude other possible causes. There were also other circumstances which have an important bearing on the ultimate question of fact. It appears that the plaintiff's foot was well healed from the prior operation at the time the defendant operated on May 12, 1944; that the plaintiff suffered great pain shortly after the cast was put on and for a considerable period, and made vigorous complaint; that nothing was done except to open a small window over the operation wound itself and apply some medication there; that that window was subsequently closed; and that when the cast was removed on June 21, an area of necrosis was found which was so serious that it would not respond to treatment over a period of several months. While there was evidence that the original injury was of a type which presents great difficulties in the matter of treatment, that the results of the prior operations and treatment were not entirely satisfactory, and that the form of treatment adopted by the defendant was proper, there was also evidence tending to show negligence in the actual performance of that treatment. The evidence, as a whole, was sufficient to support the verdict.

It is next contended that the court refused to instruct the jury on the necessity of medical testimony to establish malpractice and, to the contrary, instructed the jury, in effect, that such testimony was not necessary and could be disregarded. Complaint is made of the refusal of two instructions which read as follows:

"Negligence upon the part of a physician is never to be presumed, and in the absence of expert testimony to the contrary, it is to be presumed that a physician possesses and has exercised the requisite degree of skill and care in examining a patient. In determining the question of whether the defendant was guilty of negligence as alleged in the complaint you cannot and must not set up a standard of your own but must be governed in that regard solely by the testimony of expert witnesses who have appeared and testified in this case."

"In this case it is necessary to have expert testimony to establish the nature of the alleged injury and that it was proximately caused by the treatment that is claimed to have been improper. You cannot consider whether, as a matter of common knowledge, the treatment rendered in this case was or was not proper but you may determine only from the testimony of the experts who have testified in the case

whether or not the plaintiff in fact suffered the injury he claims as the result of the treatment alleged to be improper.''

It is argued that the first of these instructions was inferentially approved in *Moore* v. *Belt,* 34 Cal.2d 525 [212 P.2d 509], and that the subject-matter of these instructions was not otherwise covered. While the wording of these instructions is subject to some criticism the subject-matter thereof, insofar as proper, was sufficiently covered in other instructions which were given.

■ The court gave the following instructions:

''In this case there has been testimony of expert witnesses on the medical procedure in use in this community, on methods of medical and surgical treatment, on the causes and courses of disease, and on other medical matters. In respect of any such testimony which has not been contradicted by any similar testimony, you are instructed as follows: Inasmuch as the subject matter of such evidence is not within the common knowledge of laymen, but is within the exclusive province of specialized study and experience, it may not be contradicted by the opinion of a non-expert, and you are not permitted to reject it, but shall find in accordance with it unless, *under the rules of law stated to you in these instructions you find* the testimony unreliable and unworthy of belief.'' (Italics ours.)

''The mere fact that the plaintiff had suffered a disability to his foot, considered alone, does not support an inference that some party, or any party, to this action was negligent.''

''The law does not permit you to guess or speculate as to the cause of the accident in question. If the evidence is equally balanced on the issue of negligence or proximate cause, so that it does not preponderate in favor of the party making the charge, then he has failed to fulfill his burden of proof.''

''To aid you in finding on the issue whether the defendant was guilty of malpractice, there are a few discriminations that you should have in mind. The law does not require of a physician and surgeon perfection, nor prophetic insight, nor infallible judgment; nor does it condemn him simply because his efforts prove unsuccessful. The difficulties and uncertainties in the practice of medicine and surgery, the unpredictable variations in response to treatment are such that no practitioner can guarantee results.''

''Where there is more than one recognized method of

diagnosis or treatment, and no one of them is used exclusively and uniformly by all practitioners in good standing, it is not negligence for a physician and surgeon if, in exercising his best judgment, he selects one of the approved methods, which later turns out to be a wrong selection, or one not favored by certain other practitioners.''

''In short, it is quite possible for a physician and surgeon to err in judgment, or to be unsuccessful in his treatment, or to disagree with others of his profession, without being negligent.''

''In malpractice suits against physicians and surgeons, as in all civil actions, negligence on the part of the physicians and surgeons may be proved by circumstantial evidence, and such circumstantial evidence, if any, need not rise to that degree of certainty which would exclude every reasonable conclusion other than that drawn by you, the jury. The facts relied upon to establish the plaintiff's case need not be of such a nature and so related to each other that negligence is the only conclusion that can be fairly or reasonably drawn therefrom. But they must prove the allegations of the complaint by a preponderance of the evidence.''

It is further argued that two of the instructions thus given had the effect of instructing the jury that medical testimony to establish malpractice was not necessary and could be disregarded. The italicized portion of the first of these instructions was added by the court, the rest of the instruction having been requested by the defendant. It is argued that the portion thus added by the court permitted the jury to disregard or reject the uncontradicted testimony of medical experts within the field of their exclusive knowledge. The portion added by the court related only to the matter of credibility, covered by the general instructions, and did not change the effect of the instruction as a whole. The jury was thus told that such expect testimony was conclusive as to matters within the medical field which are not within the common knowledge of laymen, that it must be accepted as such, that it could not be contradicted by the opinion of a nonexpert, and that it must not be rejected unless it could be found unworthy of belief under some other rule of law. The court also instructed the jury that it was not to single out any certain sentence or portion of an instruction and ignore the others, but that it was to consider all of the instructions as a whole. Assuming that the portion added by the court was unnecessary, no reversible error appears.

■ It is also argued that the last of these instructions erroneously told the jury that it could base a holding of malpractice on circumstantial evidence, rather than on the medical testimony, and invited the jurors to disregard the testimony of the experts and decide the case upon their own ideas of proper methods of treatment and other medical matters, and to infer malpractice from the ultimate outcome of the treatment. While it would have been better to have omitted a part, at least, of this instruction in a case of this nature, we are unable to agree that it had the effect of inviting the jury to disregard the testimony of the experts and to substitute their own ideas of proper methods of medical treatment. While there was much expert testimony there was also evidence of a number of circumstances, outside the field of that testimony, which could properly be taken into consideration. The instructions as a whole covered all of the material issues, and it does not appear that any portions thereof were sufficiently prejudicial to justify a reversal. None of the instructions can be interpreted as permitting the jury to disregard the expert testimony with respect to the medical questions which were exclusively within the knowledge of the experts.

It is unnecessary to consider in detail the further contentions that the court erred in two other minor matters in the instructions; and that the plaintiff's counsel was guilty of misconduct in one respect in arguing to the jury, and in several respects in his cross-examination of Dr. West. It is conceded that the latter matters were not repeated after they were objected to, and none of the matters referred to could reasonably be thought to have affected the verdict.

The judgment is affirmed.

Griffin, J., and Mussell, J., concurred.

A petition for a rehearing was denied August 5, 1955, and appellant's petition for a hearing by the Supreme Court was denied September 8, 1955. Edmonds, J., Schauer, J., and Spence, J., were of the opinion that the petition should be granted.