[Civ. No. 18804. First Dist., Div. One. Dec. 8, 1960.]

MARGARET I. BLACK et al., Appellants, v. VINCE C. CARUSO et al., Respondents.

Jack H. Werchick for Appellants.

Appelbaum, Mitchell & Bennett, Lewis N. Mitchell, Joseph F. Rankin and Richard G. Logan for Respondents.

DUNIWAY, J.—Plaintiffs appeal from an adverse judgment, entered upon a jury verdict in a wrongful death action. The charge is malpractice. Defendant Wise is a doctor; defendant Caruso is the owner and operator of an ambulance service. Appellants contend that the evidence does not support the verdict, that the court erred in giving and refusing certain instructions, and that it also erred in making certain statements when the jury requested a rereading of certain instructions in the course of its deliberations. We find no error.

1. *The evidence supports the verdict.*

After the filing of the appeal, appellants' counsel sought, by motion in this court, to be allowed to produce additional evidence based upon a newspaper account of a report by the California Medical Association in which certain statements were said to have been made about this case. We denied the motion. Nevertheless, both in his reply brief and in oral argument, counsel relied upon this "evidence." It is not before us. Confining ourselves to the record, we find that it shows the following: Appellants' decedent was in an automobile accident near the town of Pittsburg. Responding to a call from the sheriff's office, the Caruso ambulance picked

him up and took him to the emergency room of the Pittsburg Community Hospital. Decedent was "semiconscious," and had alcohol on his breath. He needed no first aid during the trip.

Dr. Wise is a general practitioner on the hospital staff, and on the evening in question was on call for emergencies. He got to the hospital within a few minutes after the ambulance arrived. The nurse had applied a pressure bandage to a wound on decedent's head. He examined the wound and applied another pressure bandage, being unable to suture the wound because of decedent's movements. The bleeding was satisfactorily taken care of; suturing could be done later. The doctor suspected a head injury and gave no anaesthetic because of the danger of doing so in such cases. By manual bone crepitation he concluded that there was probably no skull fracture. (The autopsy disclosed none.) The pulse, taken manually, was good and strong. Decedent's eyes showed dilated and divergent pupils, indicating a head injury or concussion or alcohol. No X-rays were taken, the doctor's experience being that the neurosurgeon would want to direct the taking of X-rays. It was, in his opinion, important to get decedent to such a specialist, although decedent showed no signs of being in immediate danger.

Decedent carried a "Blue Cross" card, and was entitled to treatment in the Pittsburg hospital, including treatment by a neurosurgeon. However, it was Dr. Wise's experience that it would take a minimum of about two hours and sometimes as much as four hours to get a staff neurosurgeon. Decedent also had a "Kaiser" card entitling him to the same treatment at the Kaiser hospital in Walnut Creek. Dr. Wise believed that there was a neurosurgeon more quickly available there. He concluded that decedent should get into the care of a neurosurgeon as promptly as possible, and ordered the decedent taken to the Kaiser hospital in the same ambulance. He gave no instructions as to treatment to the ambulance men, having confidence in them from prior experience. He did not phone the hospital or decedent's home, or have anyone else do so, because he had confidence in the set-up at Walnut Creek, and relied on it.

Dr. Wise did not think the patient was in danger of death. He did not anticipate any permanent or serious injury. A head injury such as decedent had does not require immediate surgery. He did think decedent had a head injury, coming from a rather severe blow. Decedent was not in shock; he was

actively pushing the doctor away when he was being examined and treated. While in the emergency room he vomited, but afterward his bronchial tree was clear, as was evidenced by his talking and swearing at the doctor. After he vomited he cleared up remarkably well, and was much brighter, which is "the usual thing we find when we treat people under liquor and they vomit." The body showed only minor bruises and skin lacerations. No knee kick or toe reflex tests were made, because they are very difficult to do on a struggling patient. The decedent showed no need of blood, and none was given. There was no sign of excessive intracranial pressure. The doctor expected that the trip could be made to Walnut Creek without any further difficulty. Nothing indicated the need of any particular instructions to the ambulance driver.

The doctor testified that for an emergency diagnosis, his was quite adequate. He would not move a patient if he seemed in any immediate danger, or if moving would worsen his condition. Brain injuries transport well, and almost always relatively safely.

Dr. Wise himself and four other doctors all testified in substance that what he did was in accord with standard practice in the community in the treatment of an emergency by a general practitioner, and met the standard of care required by law.

When decedent was placed in the ambulance, he was quiet, pale and appeared to be asleep, or going to sleep, as if he had had a sedative. He appeared to remain in this condition during the 20 minutes' trip to Walnut Creek, but was found to be dead on arrival there.

Appellants' counsel has marshalled evidence favorable to his clients in his brief, but he nowhere points out wherein the evidence does not support the verdict. In view of the testimony of the doctors, we think that there is nothing in his argument, and that the verdict is clearly supported. In the case of defendant Caruso, there appears to us to be no evidence that would support a verdict against him, and appellant points to none. In the case of Dr. Wise, the record of a long trial is remarkably lacking in any testimony indicating that anything that he did, or any omission on his part, was actually a cause of death. One of the specialists, a neurosurgeon, testified that in his opinion decedent would have died irrespective of the treatment given him by Dr. Wise. The cause of death was cerebral contusions, leading to pulmonary edema—a congestion of the lungs. In layman's lan-

guage, death resulted from a head injury. Five doctors so testified.

In holding the evidence sufficient, as we must in this case, the jury and not this court being the fact-finding body, we do not wish to be understood as approving what was done by the defendant doctor. To us, as laymen, the handling of decedent is shocking, even though it may not have caused the death in this particular case. Nothing was done to determine whether in fact a neurosurgeon might be promptly available at the Pittsburg hospital, where the decedent was entitled to such treatment. Nothing was done, before he was shipped off, unattended by any qualified nurse or doctor, and with no instructions to the ambulance crew, to determine whether a neurosurgeon was any more readily available at Walnut Creek. In fact, a neurosurgeon was not so available there. The hospital there was not alerted. No attempt was made to communicate with decedent's wife. But because, under the evidence, the jury could, and presumably did, find either that Dr. Wise was not negligent, or, if he was, that the negligence did not cause death, we cannot hold that the verdict is unsupported.

2. *The court's instructions were not erroneous.*

Appellants criticize three instructions. As to the first,[1] it is claimed that the use of the words "want of skill or negligence," in the alternative, could only confuse the jury. We think not. If the terms had been used in the conjunctive, there might have been error, as a doctor is required to be both skillful and careful, and the lack of either skill *or* due care may make him liable. It is also claimed that the instruction indicates that no recovery could be had against Caruso unless Dr. Wise were found liable. However, the court gave separate

---

[1] "You are instructed that this is an action for damages for alleged malpractice; or, in other words, one predicated upon a claim of want of skill or negligence upon the part of the defendant D. C. Wise. Before the plaintiff can recover in such an action, it must be proved to you by a preponderance of the evidence that the defendant D. C. Wise, in the care and treatment of James Black, either did something, some particular thing or things that physicians and surgeons of ordinary skill, care and diligence, engaged in the same kind of work or specialty, would not have done under like or similar conditions or circumstances; or that the defendant did some particular thing or things in a manner that such physicians and surgeons of ordinary skill, care and diligence would not have done under like or similar circumstances or conditions; or that the defendant failed or omitted to do some particular thing or things that such physicians or surgeons of ordinary care, skill and diligence practicing in the same community or vicinity would have done under the same or similar circumstances, and that said affirmative or negative conduct was a proximate cause of the patient's death."

instructions applicable to Caruso, and the one complained of is clearly applicable only to Wise. Under the circumstances, we do not find the instruction confusing. Nor does the instruction set up an incorrect standard, as appellant claims. This is because, in the next paragraph of its instructions, the court correctly defined the degree of care and skill required of a physician. The instructions must, of course, be taken together, and the jury was so advised. There was no conflict between the two; one supplemented and clarified the other. (*Cf. Scarano* v. *Schnoor,* 158 Cal.App.2d 612, 618 [323 P.2d 178, 68 A.L.R.2d 416].) Lastly, appellant objects to the phrase ''said affirmative or negative conduct'' at the end of the instruction. We see nothing confusing or erroneous in the phrase, which obviously refers back to the two types of conduct, doing or failing to do, that the court had just described.

 The second criticized instruction[2] was apparently taken verbatim from an instruction approved in *Norden* v. *Hartman,* 134 Cal.App.2d 333 [285 P.2d 977]. Again, this instruction cannot be considered alone. It immediately followed the instruction in which the court correctly defined the degree of learning and skill, and the duty of care, required of the doctor. Taken together with that instruction, it does not misstate the law in referring to ''more than one recognized method of diagnosis or treatment.'' The court is not required to restate all his instructions in each sentence thereof.

 The same, we think, can be said of a third instruction[3]

[2] ''To aid you in finding on the issue whether defendant was guilty of malpractice, you should have in mind a few discriminations. The law does not require of a physician and surgeon perfection, nor prophetic insight, nor infallible judgment; nor does it condemn him simply because his efforts prove unsuccessful. The difficulties and uncertainties in the practice of medicine and surgery, the unpredictable variations in response to treatment are such that no practitioner can guarantee results.

''Where there is more than one recognized method of diagnosis or treatment, and no one of them is used exclusively and uniformly by all practitioners of good standing, it is not negligence for a physician and surgeon if, in exercising his best judgment, he selects one of the approved methods, which later turns out to be a wrong selection, or one not favored by certain other practitioners.

''In short, it is quite possible for a physician and surgeon to err in judgment, or to be unsuccessful in his treatment, or to disagree with others of his profession, without being negligent.''

[3] ''You are instructed that it is not negligence to fail to foresee and guard or provide against, or take precautionary measures to prevent accidents or injuries or death resulting from a peculiar, unusual, and unexpected occurrence which could not have been reasonably anticipated.''

criticized by appellants. In this case the jury could well have found that the death "could not have been reasonably anticipated." The instruction does not, as appellants suggest, tell the jury that that is what happened; it does correctly state what the applicable law is. (See *Tucker* v. *Lombardo*, 47 Cal. 2d 457, 464-465 [303 P.2d 1041].)

3. *The court properly refused appellant's instructions.*

■ Proposed instructions 11 and 12 state in substance that appellants can establish their case by testimony of the defendant doctor in a malpractice case. The subject was adequately covered elsewhere. Instruction No. 2 would tell the jury to disregard testimony that is contrary to physical facts. The court did tell the jury that in considering the credibility of a witness it should consider "whether the statements made . . . are consistent with . . . facts established . . . by other evidence or . . . admitted." This was sufficient. Proposed instruction No. 45 goes to the burden of proof. That too was sufficiently covered elsewhere, and in language that we consider fairer to both sides than the proposed instruction.

We do not find the court's instructions, either separately or taken as a whole, unfair or inaccurate. The case is one in which it would be expected that the jury would tend to lean toward the plaintiffs and against the doctor. Under the circumstances, the court carefully held the balance between the parties and properly rejected the instructions as to which appellants now complain. They were not unfair or improper, but some of them were so phrased as to tend to emphasize the plaintiffs' position. The court was not required to instruct in appellants' words, but only to give a correct exposition of the law.

■ There remains the question of res ipsa loquitur, as to which three instructions were proposed. Respondents criticize their form, but we will assume (we do not decide) that the form was proper. We do not think that the record supports the application of the doctrine here. We consider the question in light of the rule that if any evidence would sustain the applicability of the theory, the instruction should have been given. ■ Three elements are required: "that the accident, or injury, must be of a kind which ordinarily does not occur in the absence of someone's negligence; that it must be caused by an agency or instrumentality in the control of the defendant; and that it must not have been due to any voluntary action or contribution on the part of plaintiff."

(*Seneris* v. *Haas*, 45 Cal.2d 811, 823 [291 P.2d 915, 53 A.L.R. 2d 124].)

In the present case we cannot find any evidence that would support a finding by the jury that the first requirement was present. We do not think that the jury could, as laymen and in the absence of expert medical testimony to that effect, find that death from head injury "ordinarily does not occur in the absence of someone's negligence." It must be remembered that this is not a case where an instrumentality under the control of the doctor caused the injury. There is nothing in the evidence that would support an inference that what the doctor did caused the death. There is really very little, if any, evidence that anything that he failed to do caused the death—that if he had done something else, the death would have been prevented. Whether what was done or not done here was proper "lay outside the realm of the layman's experience." (*Huffman* v. *Lindquist*, 37 Cal.2d 465, 474 [234 P.2d 34, 29 A.L.R.2d 485]; and see *Salgo* v. *Leland Stanford etc. Board of Trustees*, 154 Cal.App.2d 560, 569-571 [317 P.2d 170]; Prosser, Torts [2d ed.] 210, 211.)

Appellants contend that there was sufficient expert testimony from which the required inference could have been drawn. The testimony on which they rely is of two types. Some of it goes to a showing that death was not caused by brain injuries, and the rest goes to Dr. Wise's failure to telephone Kaiser to ascertain whether a neurosurgeon was on duty. The fact that decedent did not die from brain injuries would not be sufficient evidence to infer that the death was more probably than not caused by the negligence of someone. Nor would Dr. Wise's failure to call be sufficient evidence from which to infer that the death was more probably than not due to negligence. Appellants' theory (apparently) is either (1) if Dr. Wise had called he would not have sent decedent to Kaiser, or (2) the lack of a telephone call demonstrates that Dr. Wise's motive in sending decedent was other than to obtain neurosurgical care. There is no evidence, however, indicating that death was due to decedent's being moved. In a supplemental memorandum, appellants claim that the evidence shows that decedent's death was caused by shock, and that if Dr. Wise had not been negligent in failing to treat for shock, death would not have ensued. The difficulty is that while this theory was embodied in the questions of appellants' counsel, the answers of the witnesses are all to the contrary.

4. *The court did not commit prejudicial error in its statements to the jury when they returned for clarification of the law.*

 The judge had a request from the foreman that he read the instruction for the care of a patient by a doctor in the emergency room, and he read that instruction. He asked the foreman if that was the instruction he had in mind, and the foreman replied: "That is the instruction. We were hoping that it would be a little more specific than the standard of care in the community. That is what our argument was about." A juror remarked that he thought there was one other point made about the "care of the patient according to law, you know, that the doctor has responsibility." The judge stated that he had read a number of instructions on the responsibility of the doctor, but that he had reread the only one that dealt with the emergency room.

Appellants contend that the instruction concerning the continuing duty of a physician was applicable to the care of a patient by a doctor in the emergency room, and that it should have been reread to the jury. The foreman, in stating: "That is the instruction," appears to have indicated that the jury wanted a reading only of the instruction that was read. That instruction is the only one which specifically mentions the emergency room.

Appellants cite *Cook* v. *Los Angeles Ry. Corp.*, 13 Cal.2d 591, 593 [91 P.2d 118], as authority for the proposition that prejudicial error can be found in the refusal to reread an instruction when the refusal is coupled with a statement that the single reread instruction is the only applicable one. In *Cook*, however, the trial court had made no effort to determine which instruction was being referred to by the requesting foreman. In that case the trial judge had cut off the foreman's request at the following point: "We would like to have that part of your instructions read—" and had then informed the jury that "[t]here is only one instruction to be given you, and that is, now did this street car stop and start according to plaintiff's evidence, or did she fall off by slipping or some other thing? That is all you have got to figure out. You should not be over fifteen minutes at most." Furthermore, the trial court in *Cook* made other remarks which tended to coerce the jury into reaching a verdict. *Cook* is obviously not in point.

 While the jury was in the jury box for purposes of clarification, a juror remarked: "What I had read—This

has never been brought up in this courtroom—I don't know whether—'' at which point he was cut off by the judge who warned the jurors that they were to decide the case entirely on the evidence and the law he had given them and that they were not to consider anything that hadn't come up in the courtroom. Appellants, citing the judge's interrupting remarks but not the juror's remarks at which they had been directed, urge that the trial judge's comments cut off the benefit of any presumptions or inferences applicable to the case and that they denied to the jury the use of its own experience and knowledge of human affairs.

The jury had been previously instructed that where negligence on the part of the doctor was shown by facts which could be evaluated by resort to common knowledge, expert testimony was not required, and that in evaluating witnesses so as to arrive at the truth they were entitled to apply their knowledge and observation of human affairs. Furthermore, when read in the context of the juror's remarks concerning that which he had read, the judge's comments hardly could be understood to preclude the jurors from applying their common knowledge of human affairs.

Affirmed.

Bray, P. J., concurred.

TOBRINER, J.—I concur.

The opinion properly points out that the ''jury could, and presumably did, find either that Dr. Wise was not negligent, or, if he was, that the negligence did not cause death,'' and that we therefore could not hold the verdict unsupported by the evidence.

I believe it important, however, to emphasize that even though the jury may have found the attending physician's conduct did not cause death, and even though we cannot hold the judgment unsupported by the evidence, the doctor did not meet his responsibilities in the matter. His failure is manifest in view of current conditions and the present developments of medical care.

As our opinion points out, the respondent doctor did not communicate with the Kaiser Hospital to notify it that he was sending a patient in need of prompt treatment by a neurosurgeon. The patient was to be transported for a distance of 17 miles to this second hospital. The patient would arrive at a late hour of night. A phone call to the Kaiser Hospital was

at the least a matter of common courtesy and conceivably a matter of life and death. The doctor did not notify, and, far less, cooperate with the Kaiser Hospital in the matter of the care of this severely injured patient.

Such failure of cooperation is particularly dangerous to the multitude of present-day victims of motor vehicle accidents. In an age of industrialism and congestion, when death and accident from motor vehicles exact a mounting toll on our streets and highways, we are peculiarly dependent upon prompt medical care. It is fitting that the medical profession is manifesting its awareness of the enormity of the problem of emergency treatment and is taking steps to meet it. As pointed out by Ernest C. Shortliffe, M.D., ''Emergency Rooms,'' (Hospitals, Journal of the American Hospital Association (February, 1960), vol. 34, p. 32) : ''Accidents now constitute the fourth cause for death in the United States and are the leading cause of death among all persons between the ages of one year and 36 years. Quite apart from this fact, however, there is a practical reason for a review of our own emergency rooms. Surveys have established that from 1940 to 1955 the emergency room load in hospitals increased by approximately 400 per cent. The administrative implications of this become apparent when we realize that 63 per cent of these hospitals report they have undertaken emergency room changes within the past two years and that a further 22 per cent of the hospitals are contemplating changes. Obviously then, the administrators of the hospitals and their medical and surgical staffs are becoming aware of difficulties in managing the emergency room patient load.''

In this complex, integrated society, a hospital and its staff no longer exist in isolation. Hospitals, like many other functionaries in the society, can no longer be regarded as private ventures but must be treated as public institutions fulfilling social responsibilities. In meeting those responsibilities the hospitals themselves have recognized the necessity for cooperation among all hospitals in a community. The Code of Ethics of the American College of Hospital Administrators and American Hospital Association states as one of its objectives: ''The hospital, therefore, should cooperate with recognized hospital associations and agencies interested in strengthening the facilities of hospitals and should assume leadership in developing cooperative action with other hospitals within the community or region to assure adequate service for all persons in need of hospital care.'' (P. 3.) Such cooperative action becomes particularly important in emergency care.

I thoroughly understand that the responsibility placed upon the hospital and its staff by the kind of problem presented here cannot be fulfilled with ease. Fortunately the medical profession is facing, and attempting to fulfill, its obligation. Unfortunately it is all too clear that the minimal requirements of that responsibility were flagrantly disregarded in this case. While we cannot hold that the death in transit was caused by the doctor's lack of cooperation with the second hospital, and while we therefore must affirm the judgment, I cannot condone the respondent doctor's performance.

A petition for a rehearing was denied January 5, 1961, and appellants' petition for a hearing by the Supreme Court was denied January 31, 1961.